# SILKWOOD, ADMINISTRATOR OF THE ESTATE OF SILKWOOD *v.* KERR-McGEE CORP. ET AL.

No. 81–2159.   Argued October 4, 1983—Decided January 11, 1984

*Michael H. Gottesman* argued the cause for appellant. With him on the briefs were *Arthur R. Angel, Robert M. Weinberg, Jeremiah A. Collins, James A. Ikard, Gerald L. Spence,* and *Daniel P. Sheehan.*

*C. Lee Cook, Jr.,* argued the cause for appellees. With him on the brief were *William G. Paul, L. E. Stringer,*

Elliott C. Fenton, Larry D. Ottaway, William T. McGrath, Pamela J. Kempin, and Richard R. Wilfong.

John H. Garvey argued the cause for the United States as amicus curiae urging affirmance. With him on the brief were Solicitor General Lee and Deputy Solicitor General Bator.*

JUSTICE WHITE delivered the opinion of the Court.

Last Term, this Court examined the relationship between federal and state authority in the nuclear energy field and concluded that States are precluded from regulating the

---

*Briefs of amici curiae urging reversal were filed for the National Women's Health Network by Anthony Z. Roisman; for the State of Arizona et al. by Robert Abrams, Attorney General of New York, Peter H. Schiff, and Ezra I. Bialik, Assistant Attorney General, Robert K. Corbin, Attorney General of Arizona, and Anthony B. Ching, Solicitor General, Joseph L. Lieberman, Attorney General of Connecticut, and Peter J. Jenkelunas, Assistant Attorney General, Tany S. Hong, Attorney General of Hawaii, and Michael A. Lilly, First Deputy Attorney General, William J. Guste, Jr., Attorney General of Louisiana, and Kendall L. Vick, Assistant Attorney General, Francis X. Bellotti, Attorney General of Massachusetts, and Stephen M. Leonard, Assistant Attorney General, Brian McKay, Attorney General of Nevada, Irwin I. Kimmelman, Attorney General of New Jersey, and James J. Ciancia, Assistant Attorney General, Anthony J. Celebrezze, Jr., Attorney General of Ohio, and E. Dennis Muchnicki, Assistant Attorney General, Leroy S. Zimmerman, Attorney General of Pennsylvania, T. Travis Medlock, Attorney General of South Carolina, and Richard P. Wilson, Assistant Attorney General, Jim Mattox, Attorney General of Texas, and David R. Richards, Executive Assistant Attorney General, and Jim Mathews, Assistant Attorney General, John J. Easton, Jr., Attorney General of Vermont, and W. Gilbert Livingston, Assistant Attorney General, Bronson C. La Follette, Attorney General of Wisconsin, and A. G. McClintock, Attorney General of Wyoming; and for the State of Minnesota by Hubert H. Humphrey III, Attorney General, and Jocelyn Furtwangler Olson, Special Assistant Attorney General.

A brief of amicus curiae urging affirmance was filed by Harry H. Voigt, Michael F. McBride, and Linda L. Hodge for the Atomic Industrial Forum, Inc.

A brief of amicus curiae was filed by Joseph H. Rodriguez and Michael L. Perlin for the New Jersey Department of the Public Advocate.

safety aspects of nuclear energy. *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Comm'n*, 461 U. S. 190, 211–213 (1983). This case requires us to determine whether a state-authorized award of punitive damages arising out of the escape of plutonium from a federally licensed nuclear facility is pre-empted either because it falls within that forbidden field or because it conflicts with some other aspect of the Atomic Energy Act.

I

Karen Silkwood was a laboratory analyst for Kerr-McGee[1] at its Cimarron plant near Crescent, Okla. The plant fabricated plutonium fuel pins for use as reactor fuel in nuclear powerplants. Accordingly, the plant was subject to licensing and regulation by the Nuclear Regulatory Commission (NRC) (then the Atomic Energy Commission) pursuant to the Atomic Energy Act, 42 U. S. C. § 2011 *et seq.* (1976 ed. and Supp. V).[2]

During a 3-day period of November 1974, Silkwood was contaminated by plutonium from the Cimarron plant. On November 5, Silkwood was grinding and polishing plutonium samples, utilizing glove boxes designed for that purpose.[3] In accordance with established procedures, she checked her hands for contamination when she withdrew them from the

---

[1] Silkwood was employed by Kerr-McGee Nuclear Corp., a subsidiary of Kerr-McGee Corp. The jury found that the former was the "mere instrumentality" of the latter. We therefore refer to both as Kerr-McGee.

[2] Under 42 U. S. C. § 2073, the Commission is authorized to issue licenses to those who handle special nuclear materials like the plutonium processed in Kerr-McGee's plant. Section 2201(b) empowers the Commission to set standards and issue instructions to govern the possession and use of such materials. On April 2, 1970, Kerr-McGee obtained a license to receive and possess special nuclear materials at its Cimarron plant. It closed the plant in 1975.

[3] A glove box is a supposedly impervious box surrounding the plutonium-processing equipment which has glove holes permitting the operator to work on the equipment or the plutonium from outside the box.

glove box. When some contamination was detected, a more extensive check was performed. A monitoring device revealed contamination on Silkwood's left hand, right wrist, upper arm, neck, hair, and nostrils. She was immediately decontaminated, and at the end of her shift, the monitors detected no contamination. However, she was given urine and fecal kits and was instructed to collect samples in order to check for plutonium discharge.

The next day, Silkwood arrived at the plant and began doing paperwork in the laboratory. Upon leaving the laboratory, Silkwood monitored herself and again discovered surface contamination. Once again, she was decontaminated.

On the third day, November 7, Silkwood was monitored upon her arrival at the plant. High levels of contamination were detected. Four urine samples and one fecal sample submitted that morning were also highly contaminated.[4] Suspecting that the contamination had spread to areas outside the plant, the company directed a decontamination squad to accompany Silkwood to her apartment. Silkwood's roommate, who was also an employee at the plant, was awakened and monitored. She was also contaminated, although to a lesser degree than Silkwood. The squad then monitored the apartment, finding contamination in several rooms, with especially high levels in the bathroom, the kitchen, and Silkwood's bedroom.

The contamination level in Silkwood's apartment was such that many of her personal belongings had to be destroyed. Silkwood herself was sent to the Los Alamos Scientific Laboratory to determine the extent of contamination in her vital body organs. She returned to work on November 13. That night, she was killed in an unrelated automobile accident. 667 F. 2d 908, 912 (CA10 1981).

---

[4] At trial, the parties stipulated that the urine samples had been spiked with insoluble plutonium, i. e., plutonium which cannot be excreted from the body. However, there was no evidence as to who placed the plutonium in the vials.

Bill Silkwood, Karen's father, brought the present diversity action in his capacity as administrator of her estate. The action was based on common-law tort principles under Oklahoma law and was designed to recover for the contamination injuries to Karen's person and property. Kerr-McGee stipulated that the plutonium which caused the contamination came from its plant, and the jury expressly rejected Kerr-McGee's allegation that Silkwood had intentionally removed the plutonium from the plant in an effort to embarrass the company. However, there were no other specific findings of fact with respect to the cause of the contamination.

During the course of the trial, evidence was presented which tended to show that Kerr-McGee did not always comply with NRC regulations. One Kerr-McGee witness conceded that the amount of plutonium which was unaccounted for during the period in question exceeded permissible limits.[5] 485 F. Supp. 566, 586 (WD Okla. 1979). An NRC official testified that he did not feel that Kerr-McGee was conforming its conduct to the "as low as reasonably achievable" standard.[6] *Ibid.* There was also some evidence that the level of plutonium in Silkwood's apartment may have exceeded that permitted in an unrestricted area such as a residence. *Ibid.*

---

[5] After allowing for hold-up (plutonium which remains in the equipment after a very thorough cleanout), the inventory difference (opening less closing) for the 1972–1976 period was 4.4 kilograms. This represented 0.522% of the 842 kilograms received by Kerr-McGee during that period. The NRC permits an inventory difference of 0.5%.

[6] Federal regulations require that "persons engaged in activities under licenses issued by the Nuclear Regulatory Commission . . . make every reasonable effort to maintain radiation exposures, and releases of radioactive materials in effluents to unrestricted areas, as low as is reasonably achievable." 10 CFR § 20.1(c) (1983). In 1974, the regulation required reasonable efforts to maintain exposures and releases "as far below the limits specified [in other portions of the regulations] as practicable." The difference in the terminology is not significant. 40 Fed. Reg. 33029 (1975).

However, there was also evidence that Kerr-McGee complied with most federal regulations. The NRC official testified that there were no serious personnel exposures at the plant and that Kerr-McGee did not exceed the regulatory requirements with respect to exposure levels that would result in significant health hazards. In addition, Kerr-McGee introduced the Commission's report on the investigation of the Silkwood incident in which the Commission determined that Kerr-McGee's only violation of regulations throughout the incident was its failure to maintain a record of the dates of two urine samples submitted by Silkwood.

The trial court determined that Kerr-McGee had not shown that the contamination occurred during the course of Silkwood's employment. Accordingly, the court precluded the jury from deciding whether the personal injury claim was covered by Oklahoma's Workers' Compensation Act, which provides the sole remedy for accidental personal injuries arising in the course of employment. Okla. Stat., Tit. 85, §§ 11, 12 (1981). Instead, the court submitted the claims to the jury on alternative theories of strict liability and negligence.[7]

The court also instructed the jury with respect to punitive damages, explaining the standard by which Kerr-McGee's conduct was to be evaluated in determining whether such damages should be awarded:

"[T]he jury may give damages for the sake of example and by way of punishment, if the jury finds the defendant or defendants have been guilty of oppression, fraud, or malice, actual or presumed. . . .

"Exemplary damages are not limited to cases where there is direct evidence of fraud, malice or gross negligence. They may be allowed when there is evidence

---

[7] In an effort to avoid a new trial in the event that the Court of Appeals disagreed with its ruling on the applicability of strict-liability principles, the court instructed the jury to answer a special interrogatory as to whether Kerr-McGee negligently allowed the plutonium to escape from its plant. The jury answered in the affirmative.

of such recklessness and wanton disregard of another's rights that malice and evil intent will be inferred. If a defendant is grossly and wantonly reckless in exposing others to dangers, the law holds him to have intended the natural consequences of his acts, and treats him as guilty of a willful wrong." 485 F. Supp., at 603 (Appendix).

The jury returned a verdict in favor of Mr. Silkwood, finding actual damages of $505,000 ($500,000 for personal injuries and $5,000 for property damage) and punitive damages of $10 million. The trial court entered judgment against Kerr-McGee in that amount.

Kerr-McGee then moved for judgment n.o.v. or a new trial. In denying that motion, the court rejected Kerr-McGee's contention that compliance with federal regulations precluded an award of punitive damages. The court noted that Kerr-McGee "had a duty under part 20 of Title 10 of the Code of Federal Regulations to maintain the release of radiation 'as low as reasonably achievable.' Compliance with this standard cannot be demonstrated merely through control of escaped plutonium to within any absolute amount." *Id.*, at 585. Therefore, the court concluded, it is not "inconsistent [with any congressional design] to impose punitive damages for the escape of plutonium caused by grossly negligent, reckless and willful conduct." *Ibid.*

Kerr-McGee renewed its contentions with greater success before the Court of Appeals for the Tenth Circuit. That court, by decision of a split panel, affirmed in part and reversed in part. 667 F. 2d 908 (1981). The court first held that recovery for Silkwood's personal injuries was controlled exclusively by Oklahoma's workers' compensation law. It thus reversed the $500,000 judgment for those injuries. The court then affirmed the property damage portion of the award, holding that the workers' compensation law applied only to personal injuries and that Oklahoma law permitted an award under a theory of strict liability in the circumstances

of this case. Finally, the court held that because of the federal statutes regulating the Kerr-McGee plant, "punitive damages may not be awarded in this case," *id.*, at 923.

In reaching its conclusion with respect to the punitive damages award, the Court of Appeals adopted a broad pre-emption analysis. It concluded that "any state action that competes substantially with the AEC (NRC) in its regulation of radiation hazards associated with plants handling nuclear material" was impermissible. *Ibid.* Because "[a] judicial award of exemplary damages under state law as punishment for bad practices or to deter future practices involving exposure to radiation is not less intrusive than direct legislative acts of the state," the court determined that such awards were pre-empted by federal law. *Ibid.*

Mr. Silkwood appealed, seeking review of the Court of Appeals' ruling with respect to the punitive damages award. We noted probable jurisdiction and postponed consideration of the jurisdictional issue until argument on the merits. 459 U. S. 1101 (1983).

## II

We first address the jurisdictional issue. This Court is empowered to review the decision of a federal court of appeals "by appeal [if] a State statute [is] held by [the] court of appeals to be invalid as repugnant to the Constitution . . . ." 28 U. S. C. § 1254(2). Mr. Silkwood argues that because the Court of Appeals invalidated the punitive damages award on pre-emption grounds and because the basis for that award was a state statute, Okla. Stat., Tit. 23, § 9 (1981),[8] the Court of Appeals necessarily held that the state statute was unconstitutional, at least as applied in this case. Accordingly, Mr. Silkwood contends, this case falls within the confines of 28 U. S. C. § 1254(2). We disagree.

---

[8] The Oklahoma statute authorizes an award of punitive damages "[i]n any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed."

In keeping with the policy that statutes authorizing appeals are to be strictly construed, *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 43 (1983); *Fornaris* v. *Ridge Tool Co.*, 400 U. S. 41, 42, n. 1 (1970), we have consistently distinguished between those cases in which a state statute is expressly struck down on constitutional grounds and those in which an exercise of authority under state law is invalidated without reference to the state statute. The former come within the scope of § 1254(2)'s jurisdictional grant. *Malone* v. *White Motor Corp.*, 435 U. S. 497, 499 (1978); *Dutton* v. *Evans*, 400 U. S. 74, 76, n. 6 (1970). The latter do not. *Perry Education Assn.*, *supra*, at 42; *Hanson* v. *Denckla*, 357 U. S. 235, 244 (1958); *Wilson* v. *Cook*, 327 U. S. 474, 482 (1946).[9] See also *County of Arlington* v. *United States*, 669 F. 2d 925 (CA4), cert. denied, 459 U. S. 801 (1982); *Minnesota* v. *Hoffman*, 543 F. 2d 1198 (CA8 1976), cert. denied *sub nom. Minnesota* v. *Alexander*, 430 U. S. 977 (1977). The present case falls into the second category.

The Court of Appeals held that because of the pre-emptive effect of federal law, "punitive damages may not be awarded in this case." 667 F. 2d, at 923. It did not purport to rule on the constitutionality of the Oklahoma punitive damages statute. The court did not mention the statute, and the parties did not contest or defend the constitutionality of the statute in their appellate briefs. While the award itself was struck down, the statute authorizing such awards was left untouched. Cf. *Perry Education Assn.*, 460 U. S., at 42. Therefore, the present appeal is not within our § 1254(2) appellate jurisdiction.[10]

---

[9] *Wilson* and *Denckla* involve appeals from state-court judgments under 28 U. S. C. § 1257 and its predecessor. However, such cases are relevant to the present issue because of "the history of . . . close relationship between" § 1254(2) and § 1257. *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 675–677, n. 11 (1974).

[10] Mr. Silkwood's reliance on *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982), is misplaced. *Grace Brethren* involved a direct appeal under 28

Nevertheless, the decision below is reviewable by writ of certiorari. *Ibid.* The issue addressed by the court below is important; it affects both the States' traditional authority to provide tort remedies to their citizens and the Federal Government's express desire to maintain exclusive regulatory authority over the safety aspects of nuclear power. Accordingly, treating the jurisdictional statement as a petition for certiorari, as we are authorized to do, 28 U. S. C. § 2103, we grant the petition and reach the merits of the Court of Appeals' ruling.

## III

As we recently observed in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U. S. 190 (1983), state law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. *Id.,* at 203–204; *Fidelity Federal Savings & Loan Assn. v. De la Cuesta,* 458 U. S. 141, 153 (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U. S. 132, 142–143 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines v. Davidowitz,* 312 U. S. 52, 67 (1941). *Pacific Gas & Electric, supra,* at 204. Kerr-McGee contends that the award in this case is invalid under either analysis. We consider each of these contentions in turn.

---

U. S. C. § 1252, a statute which we have construed more broadly because of Congress' clear intent to create an "exception to the policy of minimizing the mandatory docket of this Court." *Id.,* at 405. See also *McLucas v. DeChamplain,* 421 U. S. 21, 31 (1975).

## A

In *Pacific Gas & Electric*, an examination of the statutory scheme and legislative history of the Atomic Energy Act convinced us that "Congress . . . intended that the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant." 461 U. S., at 205. Thus, we concluded that "the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *Id.*, at 212.

Kerr-McGee argues that our ruling in *Pacific Gas & Electric* is dispositive of the issue in this case. Noting that "regulation can be as effectively exerted through an award of damages as through some form of preventive relief," *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 247 (1959), Kerr-McGee submits that because the state-authorized award of punitive damages in this case punishes and deters conduct related to radiation hazards, it falls within the prohibited field. However, a review of the same legislative history which prompted our holding in *Pacific Gas & Electric*, coupled with an examination of Congress' actions with respect to other portions of the Atomic Energy Act, convinces us that the pre-empted field does not extend as far as Kerr-McGee would have it.

As we recounted in *Pacific Gas & Electric*, "[u]ntil 1954 . . . the use, control, and ownership of nuclear technology remained a federal monopoly." 461 U. S., at 206. In that year, Congress enacted legislation which provided for private involvement in the development of atomic energy. Atomic Energy Act of 1954, Act of Aug. 30, 1954, ch. 1073, 68 Stat. 919, as amended, 42 U. S. C. §2011 *et seq.* (1976 ed. and Supp. V). However, the Federal Government retained extensive control over the manner in which this development occurred. In particular, the Atomic Energy Commission was given "exclusive jurisdiction to license the transfer,

delivery, receipt, acquisition, possession, and use of nuclear materials." *Pacific Gas & Electric, supra*, at 207. See 42 U. S. C. §§ 2014(e), (z), (aa), 2061–2064, 2071–2078, 2091–2099, 2111–2114 (1976 ed. and Supp. V).

In 1959 Congress amended the Atomic Energy Act in order to "clarify the respective responsibilities . . . of the States and the Commission with respect to the regulation of byproduct, source, and special nuclear materials." 42 U. S. C. § 2021(a)(1). See S. Rep. No. 870, 86th Cong., 1st Sess., 8–12 (1959). The Commission was authorized to turn some of its regulatory authority over to any State which would adopt a suitable regulatory program. However, the Commission was to retain exclusive regulatory authority over "the disposal of such . . . byproduct, source, or special nuclear material as the Commission determines . . . should, because of the hazards or potential hazards thereof, not be disposed of without a license from the Commission." 42 U. S. C. § 2021(c)(4). The States were therefore still precluded from regulating the safety aspects of these hazardous materials.[11]

Congress' decision to prohibit the States from regulating the safety aspects of nuclear development was premised on its belief that the Commission was more qualified to determine what type of safety standards should be enacted in this complex area. As Congress was informed by the AEC, the 1959 legislation provided for continued federal control over the more hazardous materials because "the technical safety considerations are of such complexity that it is not likely that any State would be prepared to deal with them during the foreseeable future." H. R. Rep. No. 1125, 86th Cong., 1st Sess., 3 (1959). If there were nothing more, this concern over the States' inability to formulate effective standards and

---

[11] At the time this suit was filed, Oklahoma had not entered into an agreement with the Commission under § 2021. Even if it had, Kerr-McGee would have still been subject to exclusive NRC safety regulation because it was licensed to possess special nuclear material in a quantity sufficient to form a critical mass. See 42 U. S. C. § 2021(b)(4) (1976 ed. and Supp. V).

the foreclosure of the States from conditioning the operation of nuclear plants on compliance with state-imposed safety standards arguably would disallow resort to state-law remedies by those suffering injuries from radiation in a nuclear plant. There is, however, ample evidence that Congress had no intention of forbidding the States to provide such remedies.

Indeed, there is no indication that Congress even seriously considered precluding the use of such remedies either when it enacted the Atomic Energy Act in 1954 or when it amended it in 1959. This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct. See *Construction Workers* v. *Laburnum Corp.*, 347 U. S. 656, 663–664 (1954).

More importantly, the only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available. After the 1954 law was enacted, private companies contemplating entry into the nuclear industry expressed concern over potentially bankrupting state-law suits arising out of a nuclear incident. As a result, in 1957 Congress passed the Price-Anderson Act, an amendment to the Atomic Energy Act. Pub. L. 85–256, 71 Stat. 576. That Act established an indemnification scheme under which operators of licensed nuclear facilities could be required to obtain up to $60 million in private financial protection against such suits. The Government would then provide indemnification for the next $500 million of liability, and the resulting $560 million would be the limit of liability for any one nuclear incident.

Although the Price-Anderson Act does not apply to the present situation,[12] the discussion preceding its enactment

---

[12] Under the Act, the NRC is given discretion whether to require plants licensed under § 2073 to maintain financial protection. 42 U. S. C. § 2210(a). Government indemnification is available only to those required

and subsequent amendment [13] indicates that Congress assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies. The Joint Committee Report on the original version of the Price-Anderson Act explained the relationship between the Act and existing state tort law as follows:

> "Since the rights of third parties who are injured are established by State law, there is no interference with the State law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity. At that point the Federal interference is limited to the prohibition of making payments through the State courts and to prorating the proceeds available." S. Rep. No. 296, 85th Cong., 1st Sess., 9 (1957).

See also H. R. Rep. No. 435, 85th Cong., 1st Sess., 9 (1957); S. Rep. No. 1605, 89th Cong., 2d Sess., 6 (1966).

Congress clearly began working on the Price-Anderson legislation with the assumption that in the absence of some subsequent legislative action, state tort law would apply. [14] This was true even though Congress was fully aware of the

---

to maintain financial protection, § 2210(c), and certain others not relevant here, § 2014(t), and the liability limitation applies only to those who are indemnified. § 2210(e). The NRC did not require plutonium processing plants to maintain financial protection until 1977, 42 Fed. Reg. 46 (1977).

[13] The 1957 version of the Price-Anderson Act was designed to expire in 1967. It was extended in 1965, Pub. L. 89–210, 79 Stat. 855, and again in 1975, Pub. L. 94–197, 89 Stat. 1111. In addition, several substantive changes were made through the years, most notably in 1966. Pub. L. 89–645, 80 Stat. 891.

[14] In sustaining the Price-Anderson Act against a constitutional challenge, we echoed that assumption, noting that before the Act was enacted the only right possessed by those injured in a nuclear incident "was to utilize their existing common-law and state-law remedies to vindicate any particular harm visited on them from whatever source." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 88, 89, n. 32 (1978).

Commission's exclusive regulatory authority over safety matters. As the Joint Committee explained in 1965:

> "The Price-Anderson Act also contained provisions to improve the AEC's procedures for regulating reactor licensees . . . . This manifested the continuing concern of the Joint Committee and Congress with the necessity for assuring the effectiveness of the national regulatory program for protecting the health and safety of employees and the public against atomic energy hazards. The inclusion of these provisions . . . also reflected the intimate relationship which existed between Congress' concern for prevention of reactor accidents and the indemnity provisions of the Price-Anderson legislation." S. Rep. No. 650, 89th Cong., 1st Sess., 4–5 (1965).

When it enacted the Price-Anderson Act, Congress was well aware of the need for effective national safety regulation. In fact, it intended to encourage such regulation. But, at the same time, "the right of the State courts to establish the liability of the persons involved in the normal way [was] maintained." S. Rep. No. 296, *supra*, at 22.

The belief that the NRC's exclusive authority to set safety standards did not foreclose the use of state tort remedies was reaffirmed when the Price-Anderson Act was amended in 1966. The 1966 amendment was designed to respond to concerns about the adequacy of state-law remedies. See, *e. g.*, S. Rep. No. 650, *supra*, at 13. It provided that in the event of an "extraordinary nuclear occurrence," [15] licensees could be required to waive any issue of fault, any charitable or govern-

---

[15] An "extraordinary nuclear occurrence" is "any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Commission determines to be substantial, and which the Commission determines has resulted or will probably result in substantial damages to persons offsite or property offsite." 42 U. S. C. § 2014(j). The Commission's criteria for defining an extraordinary nuclear occurrence are located at 10 CFR §§ 140.81–140.85 (1983).

mental immunity defense, and any statute of limitations defense of less than 10 years. 42 U. S. C. § 2210(n)(1). Again, however, the importance of the legislation for present purposes is not so much in its substance, as in the assumptions on which it was based.

Describing the effect of the 1966 amendment, the Joint Committee stated:

> "By requiring potential defendants to agree to waive defenses the defendants' rights are restricted; concomitantly, to this extent, the rights of plaintiffs are enlarged. Just as the rights of persons who are injured are established by State law, the rights of defendants against whom liability is asserted are fixed by State law. What this subsection does is to authorize the [NRC] to require that defendants covered by financial protection and indemnity give up some of the rights they might otherwise assert." S. Rep. No. 1605, 89th Cong., 2d Sess., 26 (1966).

Similarly, when the Committee outlined the rights of those injured in nuclear incidents which were not extraordinary nuclear occurrences, its reference point was again state law. "Absent . . . a determination [that the incident is an "extraordinary nuclear occurrence"], a claimant would have exactly the same rights that he has today under existing law—including, perhaps, benefit of a rule of strict liability if applicable State law so provides." *Id.*, at 12. Indeed, the entire discussion surrounding the 1966 amendment was premised on the assumption that state remedies were available notwithstanding the NRC's exclusive regulatory authority. For example, the Committee rejected a suggestion that it adopt a federal tort to replace existing state remedies, noting that such displacement of state remedies would *engender great opposition.* Hearings before the Joint Committee on Atomic Energy on Proposed Amendments to Price-Anderson Act Relating to Waiver of Defenses, 89th Cong., 2d Sess., 31, 75 (1966); S. Rep. No. 1605, *supra*, at 6–9. If other provi-

sions of the Atomic Energy Act already precluded the States from providing remedies to its citizens, there would have been no need for such concerns.  Other comments made throughout the discussion were similarly based on the assumption that state remedies were available.[16]

Kerr-McGee focuses on the differences between compensatory and punitive damages awards and asserts that, at most, Congress intended to allow the former.  This argument, however, is misdirected because our inquiry is not whether Congress expressly allowed punitive damages awards.  Punitive damages have long been a part of traditional state tort law.  As we noted above, Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted.  Thus, it is Kerr-McGee's burden to show that Congress intended to preclude such awards.  See *Electrical Workers* v. *Foust*, 442 U. S. 42, 53 (1979) (BLACKMUN, J., concurring in result).  Yet, the company is unable to point to anything in the legislative history or in the regulations that indicates that punitive damages were not to be allowed.  To the contrary, the regulations issued implementing the insurance provisions of the Price-Anderson Act themselves contemplate that punitive damages might be awarded under state law.[17]

---

[16] Atomic Energy Commission General Counsel Hennessey testified that "[i]t would appear eminently reasonable to avoid disturbing ordinary tort law remedies with respect to damage claims where the circumstances are not substantially different from those encountered in many activities of life which cause damage to persons and property." Hearings before the Joint Committee on Atomic Energy on Proposed Amendments to Price-Anderson Act Relating to Waiver of Defenses, 89th Cong., 2d Sess., 35 (1966).

See also *id.*, at 41 ("the amendments would not actually change the structure of the tort laws of the various states.  The legal principles of state law would remain unchanged, but certain of the issues and defenses . . . would be affected").

[17] Following the 1966 amendment, the Commission published a form for nuclear energy liability policies and indemnity agreements.  After reciting the waivers being made by the licensee in the event of an extraordinary nuclear occurrence, the form contains the following provision: "The waiv-

In sum, it is clear that in enacting and amending the Price-Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

We do not suggest that there could never be an instance in which the federal law would pre-empt the recovery of damages based on state law. But insofar as damages for radiation injuries are concerned, pre-emption should not be judged on the basis that the Federal Government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law. We perceive no such conflict or frustration in the circumstances of this case.

---

ers set forth . . . above do not apply to . . . [a]ny claim for punitive or exemplary damages . . . ." 10 CFR § 140.91, Appendix A, ¶ 2(c), p. 801 (1983).

Had the Commission thought that punitive damages awards were precluded by earlier legislation, as Kerr-McGee suggests, there would have been no need to state that the waivers did not apply to such awards. Since the waivers do not apply at all to the present situation, the clear implication is that punitive damages are available, if state law so provides.

### B

The United States, as *amicus curiae*, contends that the award of punitive damages in this case is pre-empted because it conflicts with the federal remedial scheme, noting that the NRC is authorized to impose civil penalties on licensees when federal standards have been violated. 42 U. S. C. § 2282 (1976 ed. and Supp. V). However, the award of punitive damages in the present case does not conflict with that scheme. Paying both federal fines and state-imposed punitive damages for the same incident would not appear to be physically impossible. Nor does exposure to punitive damages frustrate any purpose of the federal remedial scheme.

Kerr-McGee contends that the award is pre-empted because it frustrates Congress' express desire "to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes." 42 U. S. C. § 2013(d). In *Pacific Gas & Electric*, we observed that "[t]here is little doubt that a primary purpose of the Atomic Energy Act was, and continues to be, the promotion of nuclear power." 461 U. S., at 221. However, we also observed that "the promotion of nuclear power is not to be accomplished 'at all costs.'" *Id.*, at 222. Indeed, the provision cited by Kerr-McGee goes on to state that atomic energy should be developed and utilized only to the extent it is consistent "with the health and safety of the public." 42 U. S. C. § 2013(d). Congress therefore disclaimed any interest in promoting the development and utilization of atomic energy by means that fail to provide adequate remedies for those who are injured by exposure to hazardous nuclear materials. Thus, the award of punitive damages in this case does not hinder the accomplishment of the purpose stated in § 2013(d).

We also reject Kerr-McGee's submission that the punitive damages award in this case conflicts with Congress' express intent to preclude dual regulation of radiation hazards. See S. Rep. No. 870, 86th Cong., 1st Sess., 8 (1959). As we

explained in Part A, Congress did not believe that it was inconsistent to vest the NRC with exclusive regulatory authority over the safety aspects of nuclear development while at the same time allowing plaintiffs like Mr. Silkwood to recover for injuries caused by nuclear hazards. We are not authorized to second-guess that conclusion.[18]

## IV

We conclude that the award of punitive damages in this case is not pre-empted by federal law. On remand Kerr-McGee is free to reassert any claims it made before the Court of Appeals which were not addressed by that court or by this opinion, including its contention that the jury's findings with respect to punitive damages were not supported by sufficient evidence and its argument that the amount of the punitive damages award was excessive. The judgment of the Court of Appeals with respect to punitive damages is therefore reversed, and the case is remanded to that court for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, dissenting.

I join JUSTICE POWELL's opinion in dissent and add comments of my own that, I believe, demonstrate (a) the incompatibility between the Court's opinion last Term in *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Comm'n*, 461 U. S. 190 (1983),

---

[18] The Government cites no evidence to support its claim that the present award conflicts with the NRC's desire to avoid penalties which put "a licensee out of business . . . or adversely affec[t] a licensee's ability to safely conduct licensed activities." 47 Fed. Reg. 9991 (1982). Thus, we need not decide whether an award could be so large as to conflict with that policy. Of course, Kerr-McGee is free to challenge the propriety of the amount of the award on remand. See text *infra*, this page.

and its opinion in the present case, and (b) the fact that the Court is by no means compelled to reach the result it espouses today.

JUSTICE POWELL's dissent well explains the fundamental incongruity of the Court's result. The Court acknowledges that Congress pre-empted state regulation of safety aspects of nuclear operations largely out of concern that States were without the technological expertise necessary to regulate them. *Ante,* at 250–251. Yet the Court concludes that Congress intended to allow a jury to impose substantial penalties upon a nuclear licensee for failure to follow what the jury regards as adequate safety procedures. The Court recognizes the paradox of its disposition, but blames the irrationality on Congress. Then, with humility, the Court explains that it is duty-bound to follow the dictates of Congress. But such institutional modesty cannot transfer the blame for the tension that today's decision injects into the regulation of nuclear power. The Court, in my view, tortures its earlier decisions and, more importantly, wreaks havoc with the regulatory structure that Congress carefully created.

I

The Court recognizes that the analytic framework for this case was established less than a year ago in *Pacific Gas.* The precise issue in that case was whether the 1954 Atomic Energy Act, 68 Stat. 921, as amended, 42 U. S. C. § 2011 *et seq.* (1976 ed. and Supp. V), pre-empted California's authority to condition the construction of a nuclear facility in California on the State's finding that adequate means of disposal were available for the plant's nuclear wastes. Two aspects of that decision control the proper disposition of the case today.

First, the Court concluded that federal pre-emption of nuclear safety regulation was full and complete:

"State safety regulation is not pre-empted only when it conflicts with federal law. Rather, the Federal Govern-

ment has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States. When the Federal Government completely occupies a given field or an identifiable portion of it, as it has done here, the test of pre-emption is whether 'the matter on which the State asserts the right to act is in any way regulated by the Federal Act,'" 461 U. S., at 212–213 (footnote omitted).

The second important aspect of *Pacific Gas* was its analysis of the California statute. Despite the broad federal pre-emption of nuclear safety concerns, the Court *upheld* the state statute. The Court recognized that the statute clearly had an effect on the safety of nuclear plant operations, *id.*, at 196–197, but it upheld the statute because its *purpose* was economic. The Court concluded that the State had adopted the regulation to prevent investments in powerplants that were likely to become white elephants due to inadequate nuclear waste storage facilities. *Ibid.* Because Congress had not meant the Atomic Energy Act to deprive States of the right to make economic decisions concerning nuclear power, the Court concluded that the regulation was not pre-empted. Thus, the fundamental teaching of *Pacific Gas* is that state regulation of nuclear power *is* pre-empted to the extent that its purpose is to regulate safety.

The principles set forth in *Pacific Gas* compel the conclusion that the punitive damages awarded in this case, and now upheld, are pre-empted. The prospect of paying a large fine—in this case a potential $10 million—for failure to operate a nuclear facility in a particular manner has an obvious effect on the safety precautions that nuclear licensees will follow. The Court does not dispute, moreover, that punitive damages are expressly designed for this purpose. Punitive damages are "private fines levied by civil juries." *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 350 (1974). See *Smith* v. *Wade*, 461 U. S. 30, 49 (1983) ("[D]eterrence of future egre-

gious conduct is a primary purpose . . . of punitive damages"). The trial court's instructions to the jury in this case explained the purpose of punitive damages:

> "The basis for allowance of punitive damages rests upon the principle that they are allowed as a punishment to the offender for the general benefit of society, both as a restraint upon the transgressor and as a warning and example to deter the commission of like offenses in the future." App. to Juris. Statement 112a.

The conduct that the jury's punitive damages award sought to regulate was the day-to-day safety procedures of nuclear licensees. There was no factual finding as to how the contamination of Karen Silkwood occurred; the trial judge expressly refused to give an instruction on intentional infliction, and the jury rejected Kerr-McGee's suggestion that Silkwood intentionally contaminated herself. See *ante*, at 243; 667 F. 2d 908, 915 (CA10 1981). It is abundantly clear, therefore, that the punitive damages award in this case deters a nuclear facility from operating in the same manner as Kerr-McGee. Authority for a State to do so, however, is precisely what the Court held to be pre-empted in *Pacific Gas*.[1] Nuclear Regulatory Commission regulations covered virtually every aspect of the incident in which Silkwood was contaminated.[2] The

---

[1] The Court's opinion in *Pacific Gas* seemed to contemplate even the precise issue in the case today. The Court explained:

"It would clearly be impermissible for California to attempt to [regulate the construction or operation of a nuclear powerplant], for such regulation, even if enacted out of nonsafety concerns, would nevertheless directly conflict with the [Commission's] exclusive authority over plant construction and operation." 461 U. S., at 212.

[2] See, *e. g.*, 10 CFR § 19.12 (1974) (requiring education of workers concerning hazards of radiation); §§ 20.101–20.108 and Appendix B (radiation dose standards for individuals both in and outside restricted areas); § 20.202 (use of personnel-monitoring equipment); § 20.203 (posting of warnings around radiation areas); § 20.402 (notification of the Commission in the event of loss or theft of nuclear materials); § 403 (notification in the

Atomic Energy Act provides a full enforcement arsenal—including criminal sanctions—to police compliance with federal standards.[3] Indeed, the Commission conducted a complete investigation into the Silkwood contamination, and found no material violation of federal regulations that could justify imposing a fine.[4] The District Court nevertheless instructed the jury to fashion a fine to encourage Kerr-McGee and other nuclear licensees to meet in the future whatever safety standard the jury considered appropriate for plutonium.[5]

---

event of exposure to radiation). Part 70 of the Regulations sets forth certain terms and conditions imposed on nuclear licenses. See, *e. g.*, §§ 70.23, 70.24, 73.1 (license applicants must be determined to have qualified personnel, equipment, and procedures adequate to protect health and safety and to protect the plant against theft or sabotage of nuclear materials); §§ 70.51, 70.53 (nuclear balance inventory and recordkeeping for special nuclear materials).

[3] 42 U. S. C. §§ 2271–2284 (1976 ed. and Supp. V). Criminal conviction for willful violations of various provisions of the Act may result in substantial fines and imprisonment. §§ 2272–2278b, 2284. The Attorney General may seek injunctive relief to prevent or stop violations of the Act or the Commission regulations or orders. § 2280. The Commission itself can impose civil penalties for violations of specific licensing provisions of the Act. § 2282. In 1980, Congress increased the maximum civil penalty to $100,000 per violation; if the violation is a continuing one, each day constitutes a separate violation. § 2282(a). Finally, the Commission can initiate proceedings to modify, suspend, or revoke any license issued under the Act, and, in an emergency, can make such action effective immediately. 10 CFR §§ 70.61–70.62 (1974).

[4] The only violations of regulations revealed by the investigation were Kerr-McGee's failure to record the voiding dates for two bioassay samples provided by Silkwood. App. to Motion to Dismiss or Affirm A17.

[5] The regulatory nature of the punitive damages award is evidenced by the jury instruction explaining how punitive damages were to be calculated:

"You may consider the financial worth of the defendant against whom such damages are awarded in determining the size of such an award that is proper under the facts of this case. That is, you may consider the wealth of defendant Kerr-McGee Nuclear Corporation in determining what amount of exemplary damages, if you find them appropriate, is consistent

The $10 million fine that the jury imposed is 100 times greater than the maximum fine that may be imposed by the Nuclear Regulatory Commission for a single violation of federal standards. The fine apparently is more than 10 times greater than the largest single fine that the Commission has ever imposed.[6] The complete federal occupation of safety regulation compels the conclusion that such an award is preempted.

It is to be noted, of course, that the same pre-emption analysis produces the opposite conclusion when applied to an award of compensatory damages. It is true that the prospect of compensating victims of nuclear accidents will affect a licensee's safety calculus. Compensatory damages therefore have an indirect impact on daily operations of a nuclear facility. But so did the state statute upheld in *Pacific Gas.* The crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate safety, whereas the purpose of compensatory damages is to compensate victims. Because the Federal Government does not regulate the compensation of victims, and because it is inconceivable that Congress intended to leave victims with no remedy at all,[7] the pre-emption analysis established by

___

with the general purpose of such an award in deterring the defendant, and others like it, from committing similar acts in the future, and for punishment of the defendant for such acts." App. to Juris. Statement 113a. The jury was instructed further that compliance with federal standards was not a complete defense to the award of punitive damages:

"You are instructed, however, that you are not bound by these standards. Your duty is to determine what constitutes the exercise of reasonable care in handling plutonium, or the existence of reckless and wanton conduct, in light of the physical characteristics of that material and the risks associated with it." *Id.*, at 102a.

[6] See N. Y. Times, Oct. 22, 1983, p. 26, col. 5 (largest fine imposed to date is $850,000).

[7] In *Pacific Gas*, the Court relied on the fact that there was no federal regulation of the economic considerations of nuclear power as clear evi-

264

*Pacific Gas* comfortably accommodates—indeed it compels—the conclusion that compensatory damages are not preempted whereas punitive damages are.

Differences in the means of calculating compensatory and punitive damages further distinguish the two, and highlight the fundamental incompatibility of punitive damages and federal standards. When a victim is determined to be eligible for a compensatory award, that award is calculated by reference to the victim's injury. Whatever compensation standard a State imposes, whether it be negligence or strict liability, a licensee remains free to continue operating under federal standards and to pay for the injury that results. This presumably is what Congress had in mind when it preempted state authority to set administrative regulatory standards but left state compensatory schemes intact. Congress intended to rely solely on federal expertise in setting safety standards, and to rely on States and juries to remedy whatever injury takes place under the exclusive federal regulatory scheme. Compensatory damages therefore complement the federal regulatory standards, and are an implicit part of the federal regulatory scheme.

Punitive damages, in contrast, are calculated to compel adherence to a particular standard of safety—and it need not be a federal standard. In setting the punitive damages award in this case, the court instructed the jury to consider "the financial worth of the defendant" and award an "amount of ex-

---

dence that Congress intended to leave such concerns to consideration of the States:

"The Nuclear Regulatory Commission . . . does not purport to exercise its authority based on economic considerations . . . . It is almost inconceivable that Congress would have left a regulatory vacuum; the only reasonable inference is that Congress intended the States to make these judgments." 461 U. S., at 207–208.

The absence of federal regulation governing the compensation of victims of nuclear accidents is strong evidence that Congress intended the matter to be left to the States.

emplary damages . . . consistent with the general purpose of such an award in deterring the defendant, and others like it, from committing similar acts in the future." 485 F. Supp. 566, 603 (WD Okla. 1979). The punitive damages award therefore enables a State to enforce a standard that is more exacting than the federal standard. Were Kerr-McGee to continue adherence only to the federal standard, it would presumably be in continuous violation of state law—an indication that the jury award in this case was too small to serve its purpose. A licensee that continues to meet only the federal standard therefore presumably will receive increasingly large punitive sanctions in subsequent personal injury suits, until compliance with the state-imposed safety standard is obtained. At that point, of course, the federal safety standard will have been entirely supplanted. It is incredible to suggest that Congress intended the Federal Government to have the sole authority to set safety regulations, but left intact the authority of States to require adherence to a different state standard through the imposition of jury fines. The obvious conflict shows that punitive damages are pre-empted.

This pre-emption analysis eliminates the "tension" that the Court concedes its disposition creates. It remains faithful to the Federal Government's expressed desire to balance the conflict between promoting nuclear power and ensuring safe operation of nuclear plants. See *Power Reactor Co. v. Electricians*, 367 U. S. 396, 404 (1961) ("the responsibility for safeguarding [public] health and safety belongs under the statute to the Commission"). It preserves the ability of States to provide compensation to their citizens for injuries caused by radiation hazards. Finally, it avoids the anomaly of a jury's imposing a fine to regulate activity considered too complicated for state regulatory experts. See H. R. Rep. No. 1125, 86th Cong., 1st Sess., 3 (1959) ("the technical safety considerations are of such complexity that it is not

likely that any State would be prepared to deal with them during the foreseeable future").

## II

For reasons never expressed in its opinion, the Court rejects the analysis outlined above and opts instead for one that it admits creates "tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability." *Ante*, at 256. But, with all respect, in struggling to reach its result, the Court never focuses on the issue in this case. Without explanation, the analysis proceeds as though the issue is whether a victim in a nuclear accident can seek judicial recourse for her injuries. That issue is not in dispute. The issue in this case is not whether a victim of radiation hazards can be compensated under state law. The issue is whether the jury can impose a fine on a nuclear operator in addition to whatever compensatory award is given.

The Court's obfuscation of the issue appears at the outset of its pre-emption analysis, where it states rhetorically:

> "[T]here is no indication that Congress even seriously considered precluding the use of [state-law] remedies either when it enacted the Atomic Energy Act in 1954 and or when it amended it in 1959. This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress would, without comment, *remove all means of judicial recourse for those injured by illegal conduct.*" *Ante*, at 251 (emphasis supplied).

In this passage, the Court responds to an argument that has not been made. Respondents have not attributed to Congress a callous intent to deprive injured victims of compen-

sation. *Pacific Gas* does not imply anything so heartless. Yet the Court's analysis never focuses on the real issue; its entire analysis proceeds as if pre-emption of punitive damages would require pre-emption of compensatory damages as well.

The source of the confusion appears to be an argument by petitioner (formerly appellant) that a pre-emption analysis of punitive damages and compensatory damages must lead to the same result on the ground that both have a regulatory *effect*.[8] Petitioner thus placed before the Court the bleak—though contrived—choice either to allow punitive damages or to deprive injured victims of "all judicial recourse" for their injuries. As pointed out above, there is no reason that similar treatment of punitive and compensatory damages is required; indeed, *Pacific Gas* requires that a distinction between the two be drawn.

The irony of the Court's approach is that *Pacific Gas*, decided less than a year ago, drew precisely the line that the Court today is unable to find. *Pacific Gas* made clear that the purpose of a statute is critical in a pre-emption analysis under the Atomic Energy Act. In that case, moreover, the parties were in serious dispute over whether the statute in question was motivated out of safety or nonsafety concerns. In this case, in contrast, there is no disagreement on the dispositive issue; the Court does not dispute that punitive damages are intended to make a nuclear operator adopt better safety procedures.

Petitioner seems also to have obscured the distinction between compensatory and punitive damages by focusing on the role of a jury in awarding compensatory damages in a State, such as Oklahoma, where compensation is allowed only on a showing of negligence.[9] Because a determination of negligence requires a jury to determine a licensee's duty of

---

[8] See Brief for Appellant 42–43; Reply Brief for Appellant 6–9.

[9] See *id.*, at 11–12.

care, petitioner argued that Congress has demonstrated a willingness to allow a jury to set a standard for licensee conduct. That being the case, petitioner suggested that there is no evidence that Congress intended not to allow a jury to impose a punitive award based on that standard.

It is not at all surprising, however, that Congress would tolerate a jury-imposed negligence standard for awarding compensation. In its desire to promote nuclear power, Congress has never expressed an intention to allow a nuclear licensee to avoid paying for any injury it causes. Indeed, where Congress has determined the liability standard for licensees, it has imposed strict liability.[10] Congress thus has demonstrated its willingness to hold a nuclear licensee liable for all injury that it causes, regardless of whether it is at fault. When a State chooses to impose a *more relaxed* liability standard on a licensee—such as negligence—the State simply eliminates part of the burden that the Federal Government is willing to have the nuclear industry bear. In effect, a State that uses a negligence standard simply subsidizes the industry at the expense of those numbers of its citizenry that are victims of radiation hazards. The fact that Congress was willing to let States *reduce* the compensatory liability of licensees is hardly support for the notion that Congress would also allow States to set—either through administrative regulation or tort law—standards of care

---

[10] The Price-Anderson Act, Pub. L. 85–256, 71 Stat. 576, was amended in 1966 to remedy what Congress perceived to be state tort law inadequacies in administering compensation for a victim of a major nuclear incident. Pub. L. 89–645, 80 Stat. 891. Those amendments require licensees, as a condition of their receiving approval of financial protection and the indemnity afforded by Price-Anderson, to waive certain state-law defenses in the event of a major nuclear incident. See 42 U. S. C. § 2210(n)(1). The waivers assure, *inter alia*, that a victim's entitlement to compensation will be determined under a strict-liability standard rather than negligence. Congress required such waivers out of concern that state laws, such as the negligence standard of liability, were ill-suited to the problems of nuclear hazards. See S. Rep. No. 1605, 89th Cong., 2nd Sess., 13 (1966).

*higher* than the federal standard, and impose fines to secure compliance with them.

Having focused on the wrong issue, the Court seeks to support its wrong result by focusing on the legislative history of the wrong statute. The Court relies heavily on comments made during consideration of the Price-Anderson Act, Pub. L. 85–256, 71 Stat. 576. Congress enacted that statute in 1957 out of concern that the potential liability arising from a nuclear occurrence exceeded the amount of insurance a licensee could obtain. Congress perceived that the unavailability of unlimited insurance was deterring private investment in nuclear energy projects. Price-Anderson therefore established a liability system to compensate victims in the event of an "extraordinary nuclear occurrence." The system has three major components: (1) it empowers the Commission to require a licensee to have financial protection up to $60 million of liability; (2) it provides for federal indemnification for the next $500 million; and (3) it sets the $560 million thus aggregated as the limit of liability for any one nuclear incident (with a procedure for apportioning that amount should claims arising from the incident exceed $560 million). After that limit, any additional compensation to victims would require further action by Congress. Price-Anderson also requires a licensee to waive certain defenses that, most importantly, make clear that in the event of an "extraordinary nuclear occurrence," the licensee will be strictly liable for the injuries it causes.

Price-Anderson's legislative history plainly demonstrates that except in the event of an extraordinary nuclear occurrence, Price-Anderson does not interfere with state tort law. For example, the Joint Committee Report on the bill that later became Price-Anderson explained:

"The basic principles *underlying the bill* are two:
"1. Since the rights of third parties who are injured are established by State law, there is no interference

with the State law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity [*i. e.*, $560 million]. At that point the Federal interference is limited to the prohibition of making payments through the State courts and to prorating the proceeds available.

"2. . . . ." S. Rep. No. 296, 85th Cong., 1st Sess., 9 (1957) (emphasis added).

The Court relies on this passage to demonstrate, in its view, that the entire corpus of "state tort law" is available for application in any suit arising out of a nuclear incident. *Ante*, at 252–254. Such an interpretation simply ignores the context of the statement, and produces a variety of incongruities that the Court fails to address.

The Court's opinion omits from its quotation the first line of the passage. That line makes clear that the passage describes only the underlying principles of the Price-Anderson Act; it does not purport to be a description of the relationship between all federal nuclear regulation and state tort law. The passage demonstrates that Price-Anderson interferes with state tort law only in certain limited situations. But the question in this case is not whether Price-Anderson pre-empted punitive damages; the issue is whether the Atomic Energy Act pre-empted punitive damages in 1954. Thus, the legislative history on which the Court bases its argument simply begs the question of how much state tort law remained in place before Price-Anderson was enacted.

It is hardly surprising, moreover, that proponents of Price-Anderson emphasized how little their proposed legislation would interfere with state tort law. As with any federal legislation that pre-empts the powers of the States, Price-Anderson undoubtedly prompted concern about federal intrusiveness. To assuage such concerns, proponents of Price-Anderson and later federal statutes regulating nuclear power

emphasized the minimal federal intrusion of the proposed legislation.[11] But such statements provide a most uncertain basis on which to interpret the pre-emption that resulted from earlier federal statutes. On the relevant issue—the pre-emption of state law accomplished by the Atomic Energy Act in 1954—this Court already has concluded that the pre-emption of nuclear safety concerns was complete.

By using Price-Anderson's legislative history in 1957 to conclude that the 1954 Act leaves all of state tort law intact, the Court implicitly proves too much. Surely the Court would concede that Congress did not intend, for example, to allow a state court to entertain a nuisance action and enjoin the operation of a nuclear powerplant on the ground that the plant was unsafe. Similarly, the Court must agree that a state court could not enjoin in a trespass action the release of effluents from a plant that was in compliance with Commission standards. Yet the Court's position rests on the notion that state tort law must be treated as an undifferentiated body of law, and that all tort remedies have been left intact.

The Court's interpretation of Price-Anderson's legislative history produces even greater incongruities in the operation of Price-Anderson itself. As explained above, the Price-Anderson liability scheme provides federal indemnification for liability above $60 million and below $560 million. The purpose of the indemnification is to provide compensation for victims and to minimize the exposure of nuclear licensees. But the Court's inconsonant holding leads to the anomalous result that in the event of a nuclear accident in which liability exceeds $60 million, the *Federal Government* might well have to pay *punitive* damages to the victims of the accident. By definition, such payments would not serve a compensatory purpose; nor would they have the deterrent effect on licens-

---

[11] See, *e. g.*, H. R. Rep. No. 435, 85th Cong., 1st Sess., 9 (1957); S. Rep. No. 1605, 89th Cong., 2d Sess., 5 (1966).

ees that justifies imposing them.    Congress could not have intended so paradoxical a result.

Once again, the logical way out of this paradox is a conclusion that Congress assumed that punitive damages would not be awarded under Price-Anderson.[12]    But such an assumption is now unavailable to the Court: the same passages the Court uses to demonstrate that "there is no interference with . . . State law" except in the event of a nuclear occurrence also make clear that even then the "Federal interference is limited to the prohibition of making payments through the state courts and to prorating the proceeds available."    Accordingly, it is clear that Price-Anderson itself would not preempt punitive damages, and the Court's position puts the Federal Government in the absurd position of paying them.

The Court's holding produces similar incongruities in the application of Price-Anderson to an accident in which liability exceeds the $560 million limit.    In that situation, Price-Anderson provides for the prorating of claims.    If punitive damages are allowed, victims with large punitive awards would receive awards greatly in excess of compensation, while other victims would receive less than full compensation.    Such a result would be grossly inequitable, and in clear conflict with Price-Anderson's goal of compensating victims of a nuclear accident.    Once again, the obvious implication of this result is that Congress assumed that punitive damages would not be available.    Yet the Court rejects this assumption by insisting that references to "state tort law" in the legislative history demonstrate that punitive damages have never been pre-empted.

---

[12] Such an assumption is fully consistent with the legislative history of the Act which, when read in context, makes clear that its objective is to provide compensation to persons that suffer injuries.    See, *e. g.*, S. Rep. No. 296, 85th Cong., 1st Sess., 8 (1957) (Price-Anderson offers "a practical approach to the necessity of providing adequate protection against liability arising from atomic hazards as well as a sound basis for *compensating the public for any possible injury or damage arising from such hazards*") (emphasis supplied).

## III

The Court's analysis ends where it began, still focused on the wrong issue. In the last paragraph of its analysis,[13] the opinion once again acknowledges the anomaly of its disposition, but explains:

> "Congress did not believe that it was inconsistent to vest the NRC with exclusive regulatory authority over the safety aspects of nuclear development while at the same time allowing plaintiffs like Mr. Silkwood to *recover for injuries caused by nuclear hazards.* We are not authorized to second-guess that conclusion" (emphasis supplied). *Ante,* at 258.

Not only are we not authorized to second-guess Congress' conclusion, but also we have not been asked to do so. At the risk of repetition, this case is not about whether Karen Silkwood's administrator can recover for her injury; it is about whether a person injured by radiation can be awarded an amount in excess of the injury sustained in order to encourage all nuclear operators to spend more on safety. On that issue, the Court's position is plainly inconsistent with its

---

[13] The next to last paragraph of the analysis seems to reflect similar confusion. The paragraph is an attempt to respond to respondents' argument that punitive damages conflict with the desire of Congress to promote nuclear power. The Court explains:

"Congress . . . disclaimed any interest in promoting the development and utilization of atomic energy by means that fail to provide adequate *remedies for those who are injured by exposure to hazardous nuclear materials.* Thus, the award of punitive damages in this case does not hinder the accomplishment of the [congressional] purpose . . . ." *Ante,* at 257 (emphasis supplied).

There is no claim in this case that Congress pre-empted remedies to compensate those who are injured by exposure to hazardous nuclear materials. Unless the statement is meant to suggest that remedies are not "adequate" unless they include punitive damages—an argument which the Court does not put forward and which would be difficult to make, given that some States do not allow punitive damages—then the statement has little relevance to the issue in this case.

earlier holding in *Pacific Gas* that "the Federal Government has occupied the entire field of nuclear safety concerns." 461 U. S., at 212. The Court's insistence on obfuscating the issue in this case cannot change the will of Congress on the issue that is truly before us.

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

The Court's decision, in effect, authorizes lay juries and judges in each of the States to make regulatory judgments as to whether a federally licensed nuclear facility is being operated safely. Such judgments then become the predicate to imposing heavy punitive damages. This authority is approved in this case even though the Nuclear Regulatory Commission (NRC) (then the Atomic Energy Commission) (AEC)—the agency authorized by Congress to assure the safety of nuclear facilities—found no relevant violation of its stringent safety requirements worthy of punishment. The decision today also comes less than a year after we explicitly held that federal law has "pre-empted" all "state safety regulation" except certain limited powers "expressly ceded to the States." *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Comm'n*, 461 U. S. 190, 212 (1983).[1] There is no express authorization in federal law of the authority the Court today finds in a State's common law of torts.

Punitive damages, unrelated to compensation for any injury or damage sustained by a plaintiff, are "regulatory" in

---

[1] In *Pacific Gas & Electric Co.*, we held:

"State safety regulation is not pre-empted only when it conflicts with federal law. Rather, the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States. When the Federal Government completely occupies a given field or an identifiable portion of it, as it has done here, the test of pre-emption is whether 'the matter on which the State asserts the right to act is in any way regulated by the Federal Act'." 461 U. S., at 212–213.

nature rather than compensatory. The Court of Appeals for the Tenth Circuit so found in this case—prior even to our decision in *Pacific Gas & Electric Co.* 667 F. 2d 908, 922 (1981). It also concluded that punitive damages are "no less intrusive than direct legislative acts of the state." *Id.*, at 923; see *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 247 (1959). I agree with the Court of Appeals.

I

The facts are instructive. During a 3-day period in November 1974, Karen Silkwood was contaminated by plutonium from one of respondent Kerr-McGee's plants that had been built and was operated pursuant to federal law and subject to extensive regulation by the AEC. Silkwood was absent from her job for only a week—from November 7 until she returned to work on November 13. That night she was killed—as the Court states—"in an unrelated automobile accident." *Ante*, at 242. There is no evidence that Silkwood suffered any specific injury,[2] temporary or permanent, other than mental distress for a short period. In a state-law tort action against Kerr-McGee brought by Silkwood's father, the jury awarded "actual damages" of $505,000 and "punitive damages" of $10 million. The District Court entered judgment on the verdict.

Where injury is sustained as a result of the operation of a nuclear facility, it is not contested that *compensatory* damages under state law properly may be awarded. Rather, in view of the purpose and effect of *punitive* damages, the question is whether such damages may be imposed not to compen-

---

[2] The autopsy after Ms. Silkwood's death indicated that her body contained 8.8 nanocuries of plutonium. AEC regulations specified that the permissible body burden of plutonium for employees of nuclear facilities was 40 nanocuries. Disagreeing with the AEC, an expert witness for petitioner speculated at trial that the amount of plutonium contamination Ms. Silkwood experienced might have manifested itself in the form of lung cancer and chromosome damage at some future date.

sate the injured citizen or her family but solely to punish and deter conduct at the nuclear facility.[3]

### A

The purpose of a punitive damages award was made clear by the District Court's instructions. The jury was authorized to impose such damages to "punish"

> "the offender for the general benefit of society, both as a restraint upon the transgressor and as a warning and example to deter the commission of like offenses in the future." 585 F. Supp. 566, 603 (WD Okla. 1979).[4]

The jury also was advised that punitive damages need not be proved by "direct evidence of fraud, malice or gross negligence." *Ibid.* Rather, these could be "inferred." *Ibid.* Although there was no evidence showing a direct causal connection between any Kerr-McGee neglect and Silkwood's minor contamination, two witnesses—testifying as experts— found fault in general with operations at the plant such as

---

[3] The distinction in this case between the two types of damages is of major importance. There is no element of regulation when compensatory damages are awarded, especially when liability is imposed without fault as authorized by state law. Moreover, personal injuries are finite. To be sure, as the compensatory award in this case illustrates, these can result in large compensatory judgments. But juries do have guidance from physicians, medical records, lost wages, and—where permanent disability or death occurs—actuarial testimony as to lost earnings and life expectancy. None of these is present when punitive damages are awarded. The contrast also is illustrated by this case. A jury with neither pretrial knowledge of nuclear plant operations nor evidence to guide or limit its discretion, chose $10 million. It could, as well, have been almost any other amount.

[4] The trial court also instructed the jury that the size of any punitive damages award should be "consistent with the general purpose of such an award in deterring the defendant, and others like it, from committing similar acts in the future, and for punishment of the defendant for such acts." 585 F. Supp., at 603.

inadequate employee training and lack of supervision.[5]  The AEC, in the discharge of its regulatory responsibility, had cited the plant some 75 times over a period of years for various minor violations.[6]  None of the violations, however, was shown to have caused the contamination, or deemed substantial enough to justify imposition of fines by the AEC.[7]  Moreover, the Commission had investigated the physical security system at the plant only two months before Silkwood's contamination and found no significant deficiencies.  After her contamination occurred, the AEC conducted an investigation of that incident.  Again, no significant violation of AEC regulations was found.  See ante, at 244; AEC Directorate of Regulatory Operations, Investigation Report No. 74–09, p. 5 (Dec. 16, 1974).

---

[5] Silkwood also proffered reports of AEC investigations of incidents occurring in 1971, 1972, and 1973.  The incidents of most concern were a fire on March 5, 1973, and radioactive seepage from a waste container discovered on September 25, 1973.  Neither incident resulted in any contamination outside the Kerr-McGee plant or in any injury from contamination of Kerr-McGee employees.  The AEC did not fine the company in either instance.  Other testimony on behalf of Silkwood criticized generally the training of new personnel, the use of respirators in contaminated areas, the design of glove boxes in the plant, and a perceived lack of awareness of Kerr-McGee employees that exposure to plutonium may cause cancer.

[6] It is evident from these facts that the AEC was diligent and thorough in overseeing the safety of the Kerr-McGee plant.

[7] In fact, except for the contamination of Silkwood that caused her to lose seven days of work, there was no evidence that anyone else had ever been injured by contamination from the Kerr-McGee plant.  There was evidence of one incident involving minor contamination outside the plant that occurred on April 17, 1972.  In that instance, three maintenance personnel at the plant violated company regulations by leaving for breakfast without checking themselves for signs of contamination.  Upon their return, it was discovered that they had received low level contamination prior to leaving for breakfast.  None of these employees was shown to have suffered any injury.  The amount of contamination involved in this incident was so minimal that an AEC official testified that there was no need for Kerr-McGee to report it to the AEC.

Nevertheless, the jury imposed $10 million of punitive damages, and on a motion for judgment n. o. v. the District Court agreed with the jury's award, based on its finding that the "escape of plutonium [was] caused by grossly negligent, reckless and willful conduct." 485 F. Supp., at 585. These serious conclusions simply were "inferred"—in the absence of specific evidence—from the fact that some plutonium contamination had occurred and from the testimony of petitioner's experts as to overall operating conditions at the plant.

The Court defends the awarding—even on the basis of inferences—of punitive damages judgments by lay juries with no competency to understand the highly sophisticated technology of nuclear facilities. In doing so, it states: "Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted. . . . [T]he company is unable to point to anything in the legislative history or in the regulations that indicates that punitive damages were not to be allowed." *Ante*, at 255. In my view, this conclusion is irreconcilable with *Pacific Gas & Electric Co.*'s pre-emption holding.

### B

We stated in *Pacific Gas & Electric Co.* that "the Federal Government has occupied entirely the field of nuclear safety concerns." 461 U. S., at 212. On its face this is a holding that state action of any kind in this area is pre-empted, whether or not Congress has been silent on specific issues that may arise. See *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 153 (1982); *United States* v. *Shimer*, 367 U. S. 374, 381–383 (1961). We reiterated this principle of pre-emption in *Pacific Gas & Electric Co.* when we held that only those "powers *expressly* ceded to the States" are not pre-empted. 461 U. S., at 212 (emphasis added).

Petitioner concedes that Congress did not refer to punitive damages in the text or legislative history of the 1954 Act or its subsequent amendments. The absence of an express ref-

erence appears plainly to bring state law of punitive damages within the sweeping pre-emption we found that Congress intended in *Pacific Gas & Electric Co.* Nevertheless, the Court today makes an exception to the rule announced only last Term by refusing to find pre-emption unless the party arguing *for* pre-emption can find direct support in the statute, legislative history, or regulations. Where broad federal pre-emption has been found, the burden of proving an exception always should be on the party who wishes to rely on state law. The Court's decision today inexplicably shifts this burden to allow state law to prevail in the absence of a showing that Congress expressly had intended to pre-empt it.

The Court does purport to find some indirect evidence of congressional intent not to pre-empt state punitive damages law in the legislative history of the Price-Anderson Act, enacted in 1957. In considering the relevance of this Act, it is important to bear in mind that it did not apply at all to the Kerr-McGee plant at the time of this incident, and that its purpose was not regulatory in any relevant sense whatever. Price-Anderson was the result of concern, particularly prevalent when experience with nuclear energy had been limited, that extraordinary nuclear disasters could occur. In anticipating such an occurrence, the primary concern—of course—was to assure compensation for persons who suffered loss or injury. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 93 (1978). A secondary, but nonetheless important concern, was that private enterprise be encouraged to build and operate nuclear powerplants to meet the anticipated energy needs of our Nation. With the then uncertain prospect of a nuclear plant disaster that would bankrupt the utility, some sort of federally backed insurance plan was desirable in the overall public interest as well as that of the primary victims who suffered injury. *Id.*, at 63–65. Accordingly, in summary, Price-Anderson provided that the aggregate liability for a single nuclear accident may not exceed $560 million. Licensees were required to pur-

chase the maximum amount of insurance available in the commercial insurance industry (approximately $60 million), and the Government agreed to indemnify licensees for the remainder. In addition, Price-Anderson required that licensees must waive all legal defenses and must agree to be subject to strict liability in the event of an extraordinary nuclear occurrence. *Id.*, at 65.

Thus, neither the Price-Anderson Act itself nor its purposes are relevant to this case. Petitioner and the Court, finding nothing whatever in the legislative history of the Atomic Energy Act, cite several statements in the legislative history of Price-Anderson that there was no intention to change state tort law.[8] There is no mention in this history of state punitive damages law. The argument, however, is that "tort law" includes both compensatory and punitive awards. This may be true generally but certainly not necessarily true in the context in which the term "tort law" was used in Price-Anderson. When considering legislation addressing the possibility of a catastrophic nuclear accident, it was natural for Congress to make clear that the availability of compensatory damages in ordinary personal injury and property damages cases was not at issue. Such damages were to be imposed without fault. Congress was not concerned in that Act with the "punishment" of nuclear plants through jury imposition of punitive damages.

However one may view the bits and pieces of the Price-Anderson Act's legislative history, for present purposes the regulatory plan would appear to be clear. The regulation of nuclear safety then, as now, had been entrusted by a different Act to an expert body with full authority to issue comprehensive regulations and assess penalties, and with the obligation to oversee the safety of nuclear operations.

---

[8] See, *e. g.*, S. Rep. No. 1605, 89th Cong., 2d Sess., 25 (1966); S. Rep. No. 296, 85th Cong., 1st Sess., 9, 22 (1957).

## II

Even if *Pacific Gas & Electric Co.* had not been decided, I would find pre-emption of punitive damages awards because they conflict with the fundamental concept of comprehensive federal regulation of nuclear safety.[9] See *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941).

## A

Congress has been committed to the policy of encouraging private development of nuclear energy from 1954 to the present.[10] We explicitly recognized this commitment in *Pacific Gas & Electric Co.*, 461 U. S., at 206–207. The economy particularly of the Western Democracies—perhaps, indeed, democracy itself—depends upon the energy that is now primarily derived from fossil sources. No informed person suggests that these sources are inexhaustible. We had a brief but shattering experience in 1973 during the embargo on Middle East oil. The effect of this experience confirmed

---

[9] Silkwood argues that the regulation of Kerr-McGee's conduct through punitive damages is an area of local, rather than federal, concern. Assuming, *arguendo*, that this assertion is correct, the degree of local concern is irrelevant. Federal pre-emption doctrine applies regardless of the importance of the issue to local authorities. *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 153 (1982). As the Court stated in *Free* v. *Bland*, 369 U. S. 663 (1962): "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Id.*, at 666.

[10] As a result of advances in nuclear technology, the percentage of total electricity produced in the United States by nuclear means rose from zero in 1954 to 12% in 1981. See Statistical Abstract of the United States, 1982–1983, p. 581; 2 Historical Statistics of the United States 826 (1975). During that period, and to this day, I do not recall that any fatalities have occurred as a result of contamination from nuclear facilities. Much of the credit for the progress and safety record of the nuclear industry also must go to Congress for enacting appropriate safety regulatory authority and to the action and oversight of the AEC and its successor, the NRC.

the wisdom—indeed necessity—of identifying and exploiting alternative energy sources—particularly for the long term. The most promising new source identified to date is nuclear-generated energy.

Public safety always has been an overriding concern both in Government regulation and the industry. Striking the balance between the need to promote nuclear development and the responsibility to insure public safety is a task that requires a unique level of professional expertise. Congress has enacted detailed legislation and created a highly qualified administrative agency to promulgate and enforce regulations.[11] Those regulations constitute a uniform body of law carefully designed to balance safety and efficiency in nuclear facilities across the country. *Northern States Power Co.* v. *Minnesota*, 447 F. 2d 1143, 1153–1154 (CA8 1971), summarily aff'd, 405 U. S. 1035 (1972).

The effectiveness of the overall program requires that nuclear policy and regulation be insulated from ad hoc, uninformed and perhaps biased decisionmaking.[12] It is reason-

---

[11] Congress gave the AEC several means of enforcing its regulations. The Act provides for injunctive remedies, civil penalties, and revocation of licenses for violation of the terms and conditions of the license. 42 U. S. C. §§ 2236, 2280, and 2282 (1976 ed. and Supp. V). The Act also provides criminal sanctions for willful violations of the Act and most AEC (NRC) regulations. 42 U. S. C. §§ 2272 and 2273 (1976 ed. and Supp. V).

[12] In recent years there has been a dramatic increase in public concern over all nuclear activities—a concern that may well influence juries. No doubt this has been caused by the public's new awareness of the potential for vast destruction through the use of nuclear weapons—an awareness evidenced by the now commonplace demonstrations and antinuclear groups and movements that can exist, of course, only in the free world. Often little or no distinction is made between nuclear powerplants designed to help insure the future of our civilization and the proliferation of nuclear weapons that could destroy it. Those who fail to see this distinction seem to be unaware of the overall safety record of the nuclear power industry in the United States and other countries. See Cohen, Most Scientists Don't Join in Radiation Phobia, Wall Street Journal, Nov. 30, 1983, p. 28, col. 4 ("even well-educated segments of the American public are badly misinformed" as to the risks associated with the nuclear power industry).

able for a nuclear facility to be held liable, even without fault on its part, to compensate for injury or loss occasioned by the operation of the facility. It is not reasonable to infer that Congress intended to allow juries of lay persons, selected essentially at random, to impose unfocused penalties solely for the purpose of punishment and some undefined deterrence. These purposes wisely have been left within the regulatory authority and discretion of the NRC.[13]

## B

This case is a disquieting example of how the jury system can function as an unauthorized regulatory medium. Under accepted principles of tort law punitive damages may not properly be awarded on the basis of negligent conduct. A jury therefore must find malicious, wanton, or grossly negligent conduct. As noted above, the evidence presented by plaintiff at the trial for the most part was wide-ranging "expert" testimony as to the overall operation of the defendant plant. There was little evidence related in any causal way to the plutonium leak that contaminated Ms. Silkwood. Nor was there any evidence whatever of the "oppression," "fraud," "malice," or "wanton reckless[ness]" mentioned in the trial court's inflammatory instructions to the jury. See *supra*, at 278.

More importantly, the trial court did not instruct the jury, as would have been proper, that if it found that Kerr-McGee

---

[13] The Atomic Energy Act currently provides that the NRC can levy civil penalties for violations of licensing provisions, rules, regulations, or orders. 42 U. S. C. § 2282(a) (1976 ed., Supp. V). The penalties may not exceed $100,000 for each violation, but where a violation is a continuing one, each day of the violation is considered a separate violation. *Ibid.* At the time of Ms. Silkwood's contamination, the maximum limit on civil penalties was $25,000. 42 U. S. C. § 2282(a), amended by Pub. L. 96–295, 94 Stat. 787. By establishing maximum fines, Congress implicitly stated its views on the size of monetary penalties it deemed sufficient to achieve both punishment and deterrence. See H. R. Rep. No 96–1070, pp. 33–34 (1980); S. Rep. No. 96–176, pp. 23–24 (1979).

had complied with the regulations there could be no finding of fraud, malice, or wanton or reckless conduct. Rather, in effect, the jury was told that *it* could decide that the regulations were invalid:

> "[S]uch regulations do not have to be accepted by you as right or accurate if they defy *human credence*, are questionable under best scientific knowledge, or can be shown not to accomplish their intended purpose." 485 F. Supp., at 606 (emphasis added).

Until today, I had not understood that a jury lawfully could be instructed on the basis of its own determination of "human credence" to conclude that a presumptively valid federal regulation simply could be ignored. This Court nevertheless—without knowing which of the jumble of instructions the jury actually followed[14]—concluded that the award of punitive damages does not conflict with the regulation program established by Congress and the AEC. On the record, it is at least more likely than not that the jury totally ignored federal regulations as authorized by the trial court. Moreover, the Court attaches no importance to the fact that the AEC—the agency that adopted the regulations and was responsible for their enforcement—investigated the Silkwood incident and found no significant violation of its regulations. See *supra*, at 277.

## C

As support for its conclusion that punitive damages and federal nuclear safety regulation do not conflict, the Court states that Congress did not intend to promote private development of nuclear power "by means that fail to provide ade-

---

[14] The instructions invited the jury to condemn the entire operation of the Kerr-McGee plant. The instructions, purporting to state "the law" that the jury was "bound to follow," were some 10,000 words long, requiring 30 pages in the printed appendix. They were repetitive, arguably conflicting, and would have confused a panel of experienced lawyers. It is unlikely that any lay juror had any idea what law he or she was called upon to apply.

quate remedies for those who are injured by exposure to hazardous nuclear materials." *Ante*, at 257. The Court cites no authority—in the statute, its history, or the regulations—for its view that Congress intended that "adequate remedies" for persons injured should include "award[s] of punitive damages." Nor was this case tried on the theory that punitive damages could be awarded as a remedy for injuries suffered by Silkwood. The instructions to the jury were precisely to the contrary, and were explicit that the purpose of punitive damages was to "punish" the "offender for the general benefit of society." *Supra*, at 276. And petitioner has not argued in this Court that the $505,000 of "actual damages" awarded were inadequate for the injury suffered in this case. The $10 million of punitive damages were simply a windfall for petitioner.

## III

In sum, the Court's decision will leave this area of the law in disarray. No longer can the operators of nuclear facilities rely on the regulations and oversight of the NRC. Juries unfamiliar with nuclear technology may be competent to determine and assess compensatory damages on the basis of liability without fault. They are unlikely, however, to have even the most rudimentary comprehension of what reasonably must be done to assure the safety of employees and the public.[15] The District Court in this case, by instructing the jury that it could infer malice, fraud, or gross negligence (see *ibid.*), in effect authorized the jury to impose punitive damages *without fault*. And, to make sure that the jury understood its standardless freedom in this respect, the

---

[15] The Court cites a House Report in which Congress expressed its misgivings about the ability of the States to deal with the complex and technical nature of the safety considerations in the nuclear industry. See H. R. Rep. No. 1125, 86th Cong., 1st Sess., 3 (1959). The Court, nevertheless, is willing to allow a jury, untrained in even the most rudimentary aspects of nuclear technology, to impose heavy penalties on the basis of its own perceptions or prejudices.

Court also instructed the jury that it could ignore the regulations prescribed by the AEC if in its opinion they defied "human credence" or "can be shown not to accomplish their intended purpose." *Supra,* at 284.

We hardly could have spoken more clearly in *Pacific Gas & Electric Co.* on April 20, 1983, on the issue of pre-emption.

> "State safety regulation is not pre-empted only when it conflicts with federal law. Rather, the Federal Government has occupied the entire field of nuclear safety concerns . . . ." 461 U. S., at 212.

This left no doubt whatever as to the sole responsibility for nuclear safety regulation under the governance of the NRC and its large staff—experts in the technology and safety controls of nuclear energy. This case makes clear the correctness of the Court's holding in *Pacific Gas & Electric. Co.* Today, the Court opens a wide and inviting door to indirect regulation by juries authorized to impose damages to punish and deter on the basis of inferences even when a plant has taken the utmost precautions provided by law. Not only is this unfair, it also could discourage investment needed to further the acknowledged national need for this alternative source of energy. I would affirm the judgment of the Court of Appeals.