Opinion
 

 HASTINGS, J.
 

 Real parties Jake Allison and 109 other individuals (hereinafter referred to as real parties) filed a personal injury and wrongful death lawsuit against petitioner Viad Corp. (hereinafter referred to as petitioner) for damages resulting from their exposure to asbestos insulation contained on locomotives. Petitioner moved for summary judgment on the grounds, inter alia, that real parties’ state law tort claims were preempted by federal law, specifically the Locomotive Boiler Inspection Act (hereinafter referred to as the BIA, formerly 45 U.S.C. §§ 22-34, now recodified in the Transportation Code, 49 U.S.C. § 20701 et seq.).
 
 [1]
 
 The superior court denied the motion and petitioner filed its petition for writ of mandate in December 1996. We issued an order to show cause and a temporary stay order on February 6, 1997. After review of the petition and supporting papers, the return filed by real parties, and the reply memorandum of petitioner, we find the superior court’s denial of the motion to be proper and deny the petition.
 

 Factual and Procedural Background
 

 Petitioner, formerly known as the Dial Corporation, is the alleged successor in interest to a now defunct steam and diesel locomotive manufacturer, Baldwin-Lima-Hamilton (BLH). Real parties are employees and relatives of employees of the Santa Fe and Southern Pacific railroads. In October 1995, real parties sued petitioner and others for negligence, strict product liability, express and implied warranty, personal injuries and wrongful death based upon their alleged exposure to asbestos contained in locomotive boiler pipe insulation.
 
 [2]
 

 In December 1996, petitioner moved for summary judgment. After taking the matter under submission, the superior court ruled, in pertinent part, as follows:
 

 “Preemption by the Boiler Inspection Act:
 

 “When originally enacted in 1911, legislative intent, as well as the specific language in the Act limited its application to common carriers with the
 
 *333
 
 goal of protecting employees from employers. Its provisions were not, therefore, so pervasive as to preempt the entire field.
 

 “The Act was amended in 1988 to include ‘any person,’ but [petitioner’s] predecessor went out of business in 1956, excluding it from the provisions of the 1988 amendment.
 

 “[Petitioner’s] motion as to this issue is therefore denied.”
 
 [3]
 

 Petitioner contends the superior court erred in finding that Congress did not intend to preempt the field of locomotive parts and equipment regulation. Petitioner does not contest the lower court’s findings on the statute of limitations issue.
 

 Introduction
 

 We begin with a discussion of preemption and the BIA.
 

 1.
 
 Preemption principles
 

 The doctrine of federal preemption is derived from the supremacy clause of the United States Constitution (art. VI) and is designed to prevent the states from impinging on federal law and policy.
 
 (Cipollone
 
 v.
 
 Liggett Group, Inc.
 
 (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407].) Preemption can occur in three instances: (1) where Congress expressly specifies that its enactment preempts state law (express preemption); (2) where there is a scheme of federal regulation so pervasive that there is a reasonable inference that Congress intended to dominate the field and state laws on the same subject are precluded (field preemption); and (3) where federal law actually conflicts with state law and it is impossible for a private party to comply with both requirements (conflict preemption).
 
 (English
 
 v.
 
 General Electric Co.
 
 (1990) 496 U.S. 72, 78-79 [110 S.Ct. 2270, 2274-2275, 110 L.Ed.2d 65].) “Preemption fundamentally is a question of congressional intent.”
 
 (Id.
 
 at pp. 78-79 [110 S.Ct. at p. 2275].) All preemption cases begin with the presumption that federal statutes do not supersede the historic police powers of the state unless Congress manifests a clear intent to do so.
 
 (Cipollone
 
 v.
 
 Liggett Group, Inc., supra,
 
 505 U.S. at p. 516 [112 S.Ct. at p. 2617];
 
 Ketchum
 
 v.
 
 Hyundai Motor Co.
 
 (1996) 49 Cal.App.4th 1672,1678 [57 Cal.Rptr.2d 595], citing
 
 Medtronic, Inc.
 
 v.
 
 Lohr
 
 (1996) 518 U.S._[116 S.Ct. 2240, 135 L.Ed.2d 700].) It is the burden of the party claiming preemption to prove Congress’s intent.
 
 (De Canas
 
 v.
 
 Bica
 
 (1976) 424 U.S. 351, 357 [96 S.Ct. 933, 937, 47 L.Ed.2d 43].)
 

 
 *334
 
 2.
 
 The BIA
 

 The BIA was enacted in 1911, as an amendment to the Federal Employers’ Liability Act (FELA, 45 U.S.C. § 51 et seq.).
 
 (Urie
 
 v.
 
 Thompson
 
 (1949) 337 U.S. 163, 189 [69 S.Ct. 1018, 1034, 93 L.Ed. 1282, 11 A.L.R.2d 252].) In its original codification, the BIA provided, inter alia: (1) that it applied to any common carrier or carriers (defined as a railroad), their officers, agents, and employees, engaged in the transportation of passengers or property by railroad; (2) that it was unlawful for any common carrier to use any locomotive engine propelled by steam unless its boiler and appurtenances were in proper condition and safe to operate, and that all boilers shall be inspected from time to time and be able to withstand such test or tests as prescribed in the rules and regulations therein; (3) that a chief inspector and two assistant inspectors shall be appointed to ascertain that common carriers observe the requirements of the act; (4) there would be fifty inspectors assigned to the different states, each having certain job qualifications; (5) that each common carrier was required to file its rules and instructions for inspection with the chief inspector; (6) that each inspector had certain specified duties; (7) that the chief inspector must report to the Interstate Commerce Commission on an annual basis; and (8) that a statement of all accidents must be filed with the chief inspector. (Pub.L. No. 383 (1911) §§ 1-8, 36 Stat. 913-916.)
 

 In addition, it contained a provision “That any common carrier violating this Act or any rule or regulation made under its provisions or any lawful order of any inspector shall be liable to a penalty of one hundred dollars for each and every such violation, to be recovered in a suit or suits to be brought by the United States attorney. . . .” (Pub.L. No. 383 (1911) §9, 36 Stat. 916.)
 

 In 1915 and 1924, the BIA was amended to include the entire locomotive and all its parts. The statute was also amended several times between 1940 and 1980 in portions not pertinent to our discussion.
 

 In 1988 and 1992, however, the civil penalty provision of the BIA was amended to read as follows: “Any person (including but not limited to a railroad; any manager, supervisor, official, or other employee or agent of a railroad; any owner, manufacturer, lessor, or lessee of railroad equipment, track, or facilities; any independent contractor providing goods or services to a railroad; and any employee of such owner, manufacturer, lessor, lessee, or independent contractor) violating sections 22 to 29 and 31 to 34 of this title, or any rule or regulation made under its provisions or any lawful order of any inspector, shall be liable to a penalty. . . .” (Former 45 U.S.C. § 34, Pub.L. No. 100-342 (1988) § 14(7), 102 Stat. 633; Pub.L. No. 102-365 (1992) § 9(a)(8), 106 Stat. 978.)
 

 
 *335
 
 The purpose in enacting the BIA was to protect train service employees and the traveling public from defective locomotive boilers and equipment.
 
 (Urie
 
 v.
 
 Thompson, supra,
 
 337 U.S. at pp. 190-191 [69 S.Ct. at pp. 1034-1035].) “[I]t has been held consistently that the [BIA] supplements the [FELA] by imposing on interstate railroads ‘an absolute and continuing duty’ to provide safe equipment. [Citations.]”
 
 {Id.
 
 at p. 188 [69 S.Ct. at p. 1034].) In addition to the civil penalty, a person harmed by violation of the BIA is given recourse to sue under FELA, which applies only to railroad employees injured while engaged in interstate commerce.
 
 (Id.
 
 at p. 189 [69 S.Ct. at p. 1034]; see
 
 Crane
 
 v.
 
 Cedar Rapids & I.C.R. Co.
 
 (1969) 395 U.S. 164, 166 [89 S.Ct. 1706, 1708, 23 L.Ed.2d 176].) FELA provides the exclusive remedy for recovery of damages against a railroad by its employees. (L
 
 illy
 
 v.
 
 Grand Trunk R. Co.
 
 (1943) 317 U.S. 481, 485 [63 S.Ct. 347, 350-351, 87 L.Ed. 411].) FELA liability is expressly limited to common carriers. (45 U.S.C. § 51.)
 

 Summary of Contentions
 

 1.
 
 Petitioner’s argument
 

 Petitioner’s argument is based principally on the 1926 case,
 
 Napier
 
 v.
 
 Atlantic Coast Line
 
 (1926) 272 U.S. 605 [47 S.Ct. 207, 71 L.Ed. 432], which specifically addressed the scope and effect of the BIA.
 
 Napier
 
 involved challenges to two state statutes which prescribed specifications for devices to be installed on locomotives. The United States Supreme Court held that states were precluded from imposing additional requirements for locomotive equipment based on the federal preemption by the BIA. The court noted that the BIA gives the Interstate Commerce Commission the power to regulate the design, construction and material of every part of the locomotive, and thus, the states may not impinge upon that authority. It determined that the BIA is intended to occupy “the field of regulating locomotive equipment used on a highway of interstate commerce,” even with respect to locomotives that are operated wholly within one state and those not engaged in hauling interstate freight or passengers.
 
 {Id.
 
 at pp. 607, 613 [47 S.Ct. at pp. 207-208, 210].)
 

 2.
 
 Real parties’ argument
 

 Real parties rely primarily on the reasoning employed by two recent Supreme Court decisions filed more than fifty years after the
 
 Napier
 
 case,
 
 Medtronic, Inc.
 
 v.
 
 Lohr, supra,
 
 518 U.S._[116 S.Ct. 2240, 135 L.Ed.2d 700], and
 
 Silkwood
 
 v.
 
 Kerr-McGee Corp.
 
 (1984) 464 U.S. 238 [104 S.Ct. 615, 78 L.Ed.2d 443]. They urge that those cases, rather than
 
 Napier,
 
 should control.
 

 
 *336
 
 Next, they argue that the BIA is expressly limited to regulating operating locomotives, in use, while on the line of a railroad, and does not apply to the work performed by real parties because it was performed in railroad terminals and repair shops, and that during the relevant time period, BIA did not regulate petitioner’s predecessor because it stopped building locomotives in 1956, before the statute was amended to include manufacturers. Finally, they contend that case law cited by petitioner applies only to cases where the alleged injury resulted from the failure to add on or install extra devices.
 

 3.
 
 Petitioner’s reply
 

 Petitioner, in its reply brief, argues that
 
 Napier,
 
 which directly addresses the issue, is still good law, and has been followed by other lower federal courts. It asserts that
 
 Medtronic
 
 and
 
 Silkwood,
 
 on the other hand, involve different statutes and are simply not applicable because an entirely different preemption analysis was employed by these cases. Finally, it asserts that the “on line” requirement is not meant to preclude the regulatory effect of the BIA, and furthermore, that there has been no factual showing that the injuries were sustained only from work performed on locomotives that were off line.
 

 Discussion
 

 Read in a vacuum, the
 
 Napier
 
 case appears to directly address and resolve the issue of whether real parties’ action is preempted by the BIA. However, we must look to a number of other factors, and, in so doing, we conclude that the action is not preempted. A more correct statement of the problem before us is: may state tort liability be imposed on a manufacturer of locomotive parts? Crucial to a discussion of this case is a thorough review of the two recent Supreme Court cases relied upon by real parties,
 
 Silkwood
 
 and
 
 Medtronic.
 

 In
 
 Medtronic, Inc.
 
 v.
 
 Lohr, supra,
 
 518 U.S. _ [116 S.Ct. 2240, 135 L.Ed.2d 700], a woman injured when her pacemaker failed sued the manufacturer of the pacemaker. The federal district court in Florida dismissed the entire complaint on the grounds that the federal statute known as the Medical Device Amendments of 1976 (MDA) (21 U.S.C. § 360c et seq.) expressly preempted state law on the safety and effectiveness of medical devices intended for human use. The United States Supreme Court, noting the presumption against preemption, examined the purpose of the legislation, the structure and purpose of the entire statute. The court first considered the presumption against preemption and then ascertained congressional purpose, not only from the preemption clause, but from the statutory framework of the
 
 *337
 
 MDA as a whole. It considered how Congress intended the MDA to affect business, consumers, and the law, and concluded that Congress did not intend to bar consumers from any relief from injuries from medical devices. It observed that the MDA did not contain any provision regarding a right of action against manufacturers. The court found nothing in the legislative history which indicated that Congress meant to preclude product liability suits, which were prevalent at the time of enactment. It reviewed the express preemption clause in the MDA, which prohibited establishment of any state
 
 requirement
 
 different from that contained in the MDA and determined that the express preemption of requirements imposed by the states did not necessarily preclude all common law tort actions. (518 U.S. at pp._-_ [116 S.Ct. at pp. 2251-2253, 135 L.Ed.2d at pp. 716-719].)
 

 In the well-known case of
 
 Silkwood
 
 v.
 
 Kerr-McGee Corp., supra,
 
 464 U.S. 238, a nuclear laboratory worker’s father sued under common law tort principles under Oklahoma law for injuries his deceased daughter had suffered from plutonium contamination. The jury’s multimillion dollar punitive damages verdict was reversed by the federal circuit court of appeals on the grounds that it was preempted by the federal Atomic Energy Act. The Supreme Court employed both a field preemption and a conflict preemption analysis, in contrast to an earlier decision,
 
 Pacific Gas & Elec.
 
 v.
 
 Energy Resources Comm’n
 
 (1983) 461 U.S. 190 [103 S.Ct. 1713, 75 L.Ed.2d 752] in which it had held that the same statute was intended to occupy the “entire field of nuclear safety concerns.”
 
 (Id.
 
 at p. 212 [103 S.Ct. at p. 1726].) It looked at the legislative history which revealed a congressional awareness of tort remedies in a related piece of legislation and found no evidence that Congress intended to preclude state law remedies. In addition, it found that the Atomic Energy Act’s scheme for the assessment of civil penalties did not conflict with an award of punitive damages.
 

 Applying the more recently articulated tests of
 
 Medtronic
 
 and
 
 Silkwood,
 
 we conclude that, notwithstanding
 
 Napier,
 
 the tort damages sought by real parties against petitioner are not preempted by the BIA. First we reexamine the policies behind the enactment of the BIA and FELA. The primary aim behind both was safety.
 

 “[W]hen Congress enacted FELA in 1908, its ‘attention was focused primarily upon injuries and death resulting from accidents on interstate railroads.’
 
 Urie
 
 [v. Thompson],
 
 supra,
 
 [337 U.S.] at 181 [69 S.Ct. at 1030]. Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the ‘ “human overhead” ’ of doing business from employees to their employers. [Citations.]”
 
 (Consolidated Rail Corporation
 
 
 *338
 
 v.
 
 Gottshall
 
 (1994) 512 U.S. 532, 542 [114 S.Ct. 2396, 2403-2404, 129 L.Ed.2d 427].)
 

 FELA has since been construed liberally to further Congress’s remedial and humanitarian goal.
 
 (Consolidated Rail Corporation
 
 v.
 
 Gottshall, supra,
 
 512 U.S. at p. 543 [114 S.Ct. at p. 2404];
 
 Urie
 
 v.
 
 Thompson, supra,
 
 337 U.S. at p. 189 [69 S.Ct. at p. 1034].) One of the primary purposes of FELA was to eliminate defenses to tort liability and to facilitate recovery.
 
 (Atchison T. & S. F. R. Co.
 
 v.
 
 Buell
 
 (1987) 480 U.S. 557, 561 [107 S.Ct. 1410, 1413, 94 L.Ed.2d 563].)
 

 Bearing this liberal construction in mind, along with the presumption against preemption, we next consider whether Congress intended that railroad employees could recover tort damages from the manufacturer of a defective locomotive part, absent any federal regulation regarding its safety.
 

 In
 
 Silkwood
 
 and
 
 Medtronic,
 
 the court was able to discern a congressional assumption that tort remedies would be available, based upon the present-day state of tort liability. In contrast, when the BIA was enacted, no private right of action against a manufacturer existed. As Witkin recounts, the strict “privity doctrine” in existence in 1911 required that in order to recover for injuries sustained from defective goods, only the immediate buyer could recover. Therefore, in our case, when the BIA was enacted, a railroad employee would have had no right of action against the manufacturer. In
 
 MacPherson
 
 v.
 
 Buick Motor Co.
 
 (1916) 217 N.Y. 382 [111 N.E. 1050], decided after the enactment of the BIA but 10 years before
 
 Napier
 
 was decided, this privity doctrine was repudiated and the duty of a manufacturer to exercise due care was extended to those persons to whom a risk of harm could be foreseen. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 948, p. 332.)
 

 The doctrine of strict liability of a manufacturer was not established until much later in
 
 Greenman
 
 v.
 
 Yuba Power Products, Inc.
 
 (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897], and in
 
 Vandermark
 
 v.
 
 Ford Motor Co.
 
 (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]. (6 Witkin, Summary of Cal. Law,
 
 supra,
 
 Torts, § 1271 at pp. 716-717.)
 
 [4]
 

 In determining congressional intent in enacting of the BIA and during the relevant pre-1956 time period, we find nothing which persuades us that
 
 *339
 
 Congress meant to preclude state tort law damages against a manufacturer. Petitioner did not meet its burden in this regard.
 
 (Silkwood
 
 v.
 
 Kerr-McGee, supra,
 
 464 U.S. at p. 258 [104 S.Ct. at pp. 626-627].)
 

 Both
 
 Silkwood
 
 and
 
 Medtronic
 
 involve a precise identification of what field is preempted by the federal legislation at issue. Because we find no intent to expressly preclude tort remedies against a manufacturer, we cannot say the field, which
 
 Napier
 
 found to be completely occupied, includes tort liabilities not contemplated at the time
 
 Napier
 
 was written.
 

 The later enactments to the BIA which added the liability of a manufacturer such as petitioner for a civil penalty are not conclusive of a determination of preemption of tort liability, as demonstrated by
 
 Silkwood.
 
 “Paying both federal fines and state-imposed punitive damages for the same incident would not appear to be physically impossible. Nor does exposure to punitive damages frustrate any purpose of the federal remedial scheme.” (464 U.S. at p. 257 [104 S.Ct. at p. 626].) For this reason, we need not further discuss real parties’ argument that petitioner was not regulated at the time the installation of the asbestos-containing insulation allegedly occurred.
 

 Petitioner contends that because
 
 Medtronic
 
 and
 
 Silkwood
 
 involve different statutes which contain express preemption language, they employ an entirely different analysis and we should follow the
 
 Napier
 
 case. However, the pronouncement by
 
 Napier
 
 that Congress has occupied the entire “field” does not result in a completely different analysis. Whether the preemption is classified as express, field, or conflict does not change the ultimate determination of congressional intent, Indeed, as the California Supreme Court recently noted: “The ‘three categories’ of preemption . . . should not be taken to be ‘rigidly distinct. Indeed field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a preempted field conflicts with Congress’ intent (either express or plainly implied) to exclude state regulation.’ . . .”
 
 (Smiley
 
 v.
 
 Citibank
 
 (1995) 11 Cal.4th 138, 148, fn. 3 [44 Cal.Rptr.2d 441, 900 P.2d 690], citing
 
 English
 
 v.
 
 General Electric Co., supra,
 
 496 U.S. at pp. 79-80, fn. 5 [110 S.Ct. at p. 2275].)
 

 Further, the fact that different subject matter is addressed by the statutes in
 
 Silkwood
 
 and
 
 Medtronic
 
 is immaterial; both speak to the availability of tort damages where there is specific federal regulation of the instrumentality that causes the injury. In fact,
 
 Medtronic
 
 specifically involves the manufacturer of a defective product.
 

 Petitioner refers us to the recent cases of
 
 Springston
 
 v.
 
 Consolidated Rail Corp.
 
 (N.D. Ohio 1994) 863 F.Supp. 535;
 
 Marshall
 
 v.
 
 Burlington Northern,
 
 
 *340
 

 Inc.
 
 (9th Cir. 1983) 720 F. 2d 1149; and
 
 In re Train Collision at Gary, Indiana
 
 (Ind.Ct.App. 1996) 670 N.E.2d 902, all of which specifically address the BIA and preemption of tort damages, relying primarily on
 
 Napier.
 
 We do not find these lower cases controlling in light of the recent pronouncements of the Supreme Court in
 
 Medtronic
 
 or
 
 Silkwood. (Nissan Motor Corp.
 
 v.
 
 Superior Court
 
 (1989) 212 Cal.App.3d 980, 982 [261 Cal.Rptr. 80] [state appellate courts not bound by the interpretation of law by federal courts lower than the United States Supreme Court].)
 

 Petitioner stresses the need for national uniformity in regulations, given the interstate nature of railroads. It contends that allowing state law tort claims would subject railroads to conflicting requirements throughout the states. In its argument before the superior court, petitioner argued that certain equipment might be required in some states and not in others, forcing the locomotive operator to stop at every state line and adjust its equipment. At oral argument before us, petitioner argued that there would be conflicting requirements even within a state where juries reached different verdicts regarding a railroad’s negligence. Neither of petitioner’s hypotheticals compels us to reach a different result.
 

 First, we note that neither of the hypotheticals is apposite to this case. There was no actual conflict between the federal regulations in effect at the time the injuries occurred and state law negligence principles. Second, while the possibility certainly exists that different juries will find varying degrees of negligence by a particular party and award different types and amounts of damages, no two individual fact patterns are identical. The hypotheticals posed by petitioner are simply too speculative a basis on which to rest a finding of preemption. (See
 
 English
 
 v.
 
 General Electric Co., supra,
 
 496 U.S. at p. 90 [110 S.Ct. at p. 2281].) In addition, the “tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability” was addressed in
 
 Silkwood.
 
 (464 U.S. at p. 256 [104 S.Ct. at p. 625].) Similarly, we find no irreconcilable conflict between the availability of state law tort damages and the federal locomotive regulatory scheme.
 
 (Elsworth
 
 v.
 
 Beech Aircraft Corp.
 
 (1984) 37 Cal.3d 540, 550 [208 Cal.Rptr. 874, 691 P.2d 630].)
 

 Conclusion
 

 In sum, we find that although
 
 Napier
 
 expressly involves the BIA and contains language that could be construed to support petitioner’s position, we must nevertheless be guided by the analysis employed more recently in
 
 Medtronic
 
 and
 
 Silkwood.
 
 Although those cases involve different statutes,
 
 *341
 
 they are more directly applicable because they involve state law tort damages. The language in
 
 Napier
 
 that Congress intended to occupy “the field of regulating locomotive equipment” must be read narrowly in light of the circumstances in existence at the time of its writing and in light of the statutory framework as a whole.
 
 [5]
 
 Using the reasoning employed in
 
 Medtronic
 
 and
 
 Silkwood,
 
 we are compelled to find that summary judgment was properly denied by the trial court.
 

 Disposition
 

 The petition is denied and the stay order is vacated. The parties are to bear their own costs on appeal.
 

 Vogel (C. S.), P. J., and Epstein, J., concurred.
 

 A petition for a rehearing was denied June 16, 1997. and petitioner’s application for review by the Supreme Court was denied September 3, 1997. Baxter, J., did not participate therein. Kennard, J., was of the opinion that the application should be granted.
 

 [1]
 

 The summary judgment motion also contended that certain of the claims were barred by the statute of limitations, and that some of the plaintiffs were barred from bringing the claims because of their dismissal of prior asbestos claims.
 

 [2]
 

 Real parties are part of a larger pool of more than 4,500 claimants nationwide who seek recovery from petitioner.
 

 [3]
 

 The motion was also denied as to the statute of limitations issue.
 

 [4]
 

 As to a wrongful death cause of action, the right was established by Lord Campbell’s Act in 1846, and all states now provide a statutory cause of action. (6 Witkin, Summary of Cal. Law,
 
 supra,
 
 Torts, § 1196, p. 632.) In California, former Code of Civil Procedure section 377 was enacted in 1872.
 

 [5]
 

 We do not discuss real parties’ contention that the BIA only regulates locomotives that are on line. Their opposition to the summary judgment did not address this issue or contain facts which would support the allegation that all work of real parties was performed off line.