[No. A081178. First Dist. Div. One. Mar. 25, 1999.]

NORMAN MONARCH, Plaintiff and Appellant, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, and III of the Discussion.

1198

**COUNSEL**

Visse & Yanez and Jess P. Yanez for Plaintiff and Appellant.

Michael L. Johnson; Thompson Coburn, Thomas R. Jayne and James W. Erwin for Defendant and Respondent.

**OPINION**

**SWAGER, J.**—In a bifurcated proceeding, the jury found that appellant's action under the Federal Employers' Liability Act (hereafter the FELA) (45 U.S.C. § 51 et seq.) to recover damages for his loss of hearing was barred by the three-year statute of limitations. The court subsequently entered judgment in favor of respondent,[1] and this appeal ensued.

Appellant complains that the trial court erred by bifurcating the statute of limitations issue, altering the order of proof, excluding evidence of equitable estoppel, instructing the jury, and dismissing his fraud cause of action. We find that no prejudicial errors were committed, and affirm the judgment.

### STATEMENT OF FACTS

Appellant began his employment with Southern Pacific in 1963, and worked thereafter as a switchman, brakeman, and conductor. During the course of his employment duties until 1990, appellant was regularly subjected to loud, irritating noises from the locomotive engine, wheels and train whistle. The intensity of the noise varied with appellant's location on the train and the duties he performed. Southern Pacific never informed appellant that the "noise" he experienced would cause permanent harm to his hearing.

In 1984, Southern Pacific retained M.T.S. Associates (hereafter M.T.S.), a consulting company that provides "hearing conservation programs" to the railroad and other industries, to collect sound level survey information,

---

[1] We will hereafter refer to respondent Southern Pacific Transportation Company as respondent or Southern Pacific.

"educate employees on the hazards of noises and what they could do to protect themselves," and conduct hearing evaluations of Southern Pacific's employees. The primary purpose of the educational aspect of the M.T.S. program implemented for respondent was to inform "railroad employees that certain levels of sound could damage their hearing." Employees were also advised that when the decibel level reached the point that they were forced to "raise their voice" to be heard in conversation, they needed to use "ear protection." The hearing evaluations were "strictly for monitoring purposes," and did not diagnose the cause of hearing loss or notify employees that they had an "on-the-job related" injury.

Appellant became aware that he suffered from hearing loss in 1984, when he was directed by Southern Pacific to take a hearing test. According to a "test card" used by M.T.S., an audiogram performed upon appellant on May 25, 1984, indicated that he suffered hearing impairment—that is an "increase in the decibel threshold"—in the left ear, while his right ear then tested "normal." The audiogram result was consistent with appellant's complaint to the technician of "hearing difficulty" in his left ear. Appellant was furnished with fitted earplugs by the technician following the 1984 test. Appellant acknowledged that he "had a concern" with his hearing in 1984, but felt it "was minor."

Appellant's hearing was tested again by M.T.S. on April 6, 1989. He then told the technician that he thought his hearing was "worse." In regard to the state of his hearing in 1989, appellant testified at trial, "I knew I had a problem." An audiogram taken in 1989 found no significant change in the left ear, but detected deterioration in the higher frequencies in the right ear.[2] The audiogram results revealed that appellant suffered from "high above normal range of hearing loss." Due to the "change in hearing" in the right ear, the evaluator made a notation on the test card questioning appellant's claim that he used hearing protection. A notation was also made that appellant was "put on the list for counseling" and further observation, and given the admonition, "strongly urge ear protection at all times in noise."[3] He was again "fitted for earplugs" for use "in the field." He was also scheduled for counseling during the next visit to the facility by M.T.S. late in 1989, but before then the contract with respondent was terminated. Appellant testified that he did not recall receiving earplugs in 1989, and did not wear hearing protection until he was directed to do so in 1992, although it was available to him earlier.

---

[2]An otologist for respondent testified that hearing loss is typically manifested first in the "high frequencies," then progresses "toward the speech frequency."

[3]According to M.T.S. protocol, employees with hearing loss were sent follow-up "notification letters" recommending use of ear protection and perhaps consultation with a physician. Due to computer error, appellant may not have received his letter.

By no later than 1990, appellant suffered from "ringing" in his ears, which he actually described as "a sound of rushing air." Prior to June 15, 1991, he learned "through the media" that exposure to loud noise may damage hearing, and related the noise and hearing loss to "where [he] worked at the time." He also testified that "99 percent of the loud noises" to which he had been exposed were generated by the "railroad." Appellant claimed, however, that the "first time" he was informed he "had a hearing problem" was in a letter from Audiometric Services dated May 27, 1992, which referred to the change in his hearing found in the 1989 test. Before that date, he only entertained "a suspicion" of hearing loss. The letter advised appellant to consult a physician. Appellant testified that upon receiving the letter he associated his hearing loss with the noise to which he had been exposed at work, and intended to make a claim with Southern Pacific.

Appellant was subsequently examined by a Dr. Riordan. Appellant told Dr. Riordan that he had "been exposed to noise produced by locomotive [engines] without wearing hearing protection." In Dr. Riordan's report, dated August 17, 1992, appellant indicated during the examination that he began experiencing ringing in the ears, or "continuous non-pulsating bilateral tinnitus," in 1988.[4] The "audiological evaluation" of appellant stated in the report was: "Bilateral high frequency sensorineural hearing loss consistent with exposure to noise and presbycusis." According to appellant's testimony at trial, he concluded that his "hearing loss was caused from work" only when he subsequently received Dr. Riordan's report in 1992.

Larry Evans, who was also a conductor for Southern Pacific until he retired in 1993, was a witness for appellant. He testified that he became aware of the requirement for Southern Pacific employees to wear hearing protection. He was not permitted to give the date the use of hearing protection became mandatory or his personal practice before that time.

DISCUSSION

I.-III.*

. . . . . . . . . . . . . . . . . . . . . . . .

IV. *The Statute of Limitations Instruction.*

■ Appellant also submits that the statute of limitations instruction given by the trial court was an incorrect statement of law. Specifically, he

---

[4]At trial, appellant denied giving Dr. Riordan that date as the onset of ringing in his ears.
*See footnote, *ante,* page 1197.

complains of language in the verdict form that asked the jury to determine whether he knew "or should . . . have known that his hearing damage was *potentially* caused by his work at Southern Pacific?" (Italics added.) Appellant asserts that the " 'potentially work-related' standard" expressed in the instructions is contrary to the test of accrual of a FELA cause of action, and "drastically reduced" the proof required to support a finding against him on the statute of limitations issue.

The FELA provides that, "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued." (45 U.S.C. § 56.) Compliance with the three-year statute of limitations is a condition precedent for recovery in a FELA action. (*Emmons* v. *Southern Pacific Transp. Co.* (5th Cir. 1983) 701 F.2d 1112, 1117; *Frasure* v. *Union Pacific R. Co.* (C.D.Cal. 1991) 782 F.Supp. 477, 479.) In cases of latent or progressive injuries, such as that suffered by appellant, the "discovery rule" directs that the cause of action does not commence to run until the plaintiff knew or should have known of the injury and its cause. (*United States* v. *Kubrick* (1979) 444 U.S. 111, 122-123 [100 S.Ct. 352, 359-360, 62 L.Ed.2d 259]; *Dubose* v. *Kansas City Southern Ry. Co.* (5th Cir. 1984) 729 F.2d 1026, 1028-1029; *Whitman* v. *CSX Transp., Inc.* (E.D. Mich. 1995) 887 F.Supp. 983, 989.)

We think the trial court's use of the "potentially caused" language was in accord with existing law. Under the discovery rule, the test is an objective inquiry into whether the plaintiff knew or should have known, in the exercise of reasonable diligence, the essential facts of injury and cause. (*Albert* v. *Maine Cent. R. Co.* (1st Cir. 1990) 905 F.2d 541, 544; *Townley* v. *Norfolk & Western Ry. Co.* (4th Cir. 1989) 887 F.2d 498, 501; *Williams* v. *Southern Pacific Transp. Co.* (S.D.Miss. 1992) 813 F.Supp. 1227, 1231.) Constructive rather than actual knowledge of the fact of causation triggers a duty to investigate the possible causes of injury. (*Fries* v. *Chicago & Northwestern Transp. Co.* (7th Cir. 1990) 909 F.2d 1092, 1096; *Albert* v. *Maine Cent. R. Co., supra,* at p. 544; *Nemmers* v. *U.S.* (7th Cir. 1986) 795 F.2d 628, 631-632; *Williams* v. *Southern Pacific Transp. Co., supra,* at p. 1232.) Thus, in accordance with the objective test, "definite knowledge" that the injury is work related is not necessary in order for the cause of action to accrue. (*Albert* v. *Maine Cent. R. Co., supra,* at p. 544; *Dubose* v. *Kansas City Southern Ry. Co., supra,* 729 F.2d at p. 1031.) Once the plaintiff believes or suspects that the "*potential* cause of his injury" is work related, an affirmative duty to investigate is imposed. (*Williams* v. *Southern Pacific Transp. Co., supra,* at p. 1232, italics added; see also *Frasure* v. *Union Pacific R. Co., supra,* 782 F.Supp. at p. 480.) "A plaintiff need not be sure which cause is

predominant, as long as [he] knows or has reason to know of a *potential cause.*" (*Tolston* v. *National R.R. Passenger Corp.* (7th Cir. 1996) 102 F.3d 863, 865, italics added; see also *Fries* v. *Chicago & Northwestern Transp. Co., supra,* at p. 1096; *Whitman* v. *CSX Transp., Inc., supra,* 887 F.Supp. at p. 989.) We find no error in the language of the instruction.

## V. *Preemption of Fraudulent Concealment Cause of Action.*[7]

■ The preponderance of appellant's brief is devoted to the argument that the trial court erred by finding his cause of action under state law for fraudulent concealment was preempted by the FELA. Appellant insists that the FELA, which "creates liability only for negligence," was not intended to "preempt state laws designed to prevent and deter intentional torts."

■ The doctrine of federal preemption is derived from the supremacy clause of the United States Constitution (art. VI, cl. 2) and is designed to prevent the states from impinging on federal law and policy. (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407].) "Under the supremacy clause . . . , federal law preempts state law where Congress so intends." (*Fenning* v. *Glenfed, Inc.* (1995) 40 Cal.App.4th 1285, 1290 [47 Cal.Rptr.2d 715].) " ' "In determining whether a state statute [or a state cause of action] is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. . . ." . . .' " (*People* ex rel. *Sepulveda* v. *Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692, 1703-1704 [19 Cal.Rptr.2d 555], citations omitted.)

"All preemption cases begin with the presumption that federal statutes do not supersede the historic police powers of the state unless Congress manifests a clear intent to do so." (*Viad Corp.* v. *Superior Court* (1997) 55 Cal.App.4th 330, 333 [64 Cal.Rptr.2d 136].) " 'Preemption of state law by federal regulation is not favored. . . .' [Citation.]" (*People* ex rel. *Sepulveda* v. *Highland Fed. Savings & Loan, supra,* 14 Cal.App.4th at p. 1708; see also *Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 525 [97 S.Ct. 1305, 1309-1310, 51 L.Ed.2d 604]; *Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447].)

Three forms of preemption may occur: (1) where Congress expressly specifies that its enactment preempts state law (express preemption); (2)

---

[7]The issue of federal preemption of state tort claims under the Safety Appliance Act (49 U.S.C. §§ 20301-20306) and the Federal Railroad Safety Act (49 U.S.C. § 20101 et seq.) is pending before the California Supreme Court. (*Carrillo* v. *ACF Industries, Inc.** (Cal.App.) review granted Sept. 2, 1998 (S072065).)

*For Supreme Court opinion see 20 Cal.4th 1158.

where the scheme of federal regulation is so pervasive that there is a reasonable inference Congress intended to dominate the field and state laws on the same subject are precluded (field preemption); and (3) where federal law actually conflicts with state law and it is impossible for a private party to comply with both requirements (conflict preemption). (*English* v. *General Electric Co.* (1990) 496 U.S. 72, 78-79 [110 S.Ct. 2270, 2274-2275, 110 L.Ed.2d 65]; *Industrial Truck Ass'n, Inc.* v. *Henry* (9th Cir. 1997) 125 F.3d 1305, 1309.) ■ The provisions of the FELA neither expressly preempt appellant's fraudulent concealment action nor fatally conflict with it. Thus, we are left with an inquiry into field preemption. ■ "To impliedly preempt a field, Congress must create a scheme of regulation so pervasive one could reasonably infer that Congress intended to occupy the field completely, leaving no room for supplemental state law." (*Nordgren* v. *Burlington Northern R. Company* (8th Cir. 1996) 101 F.3d 1246, 1251; see also *Fidelity Federal Sav. & Loan Assn.* v. *de la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664].) "Where Congress intends to occupy a field, state law in that field is preempted. *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 212-213, 103 S.Ct. 1713, 1726-27, 75 L.Ed.2d 752 (1983)." (*Springston* v. *Consolidated Rail Corp.* (6th Cir. 1997) 130 F.3d 241, 244.)

■ The FELA has been uniformly found to comprise "the exclusive remedy for injured railroad employees. *Wabash R.R. Co.* v. *Hayes,* 234 U.S. 86, 34 S.Ct. 729, 58 L.Ed. 1226, (1914); *Janelle v. Seaboard Coast Line R.R. Co.,* 524 F.2d 1259, 1261 (5th Cir.1975). FELA is worded broadly and is interpreted even more broadly." (*Earwood* v. *Norfolk Southern Ry. Co.* (N.D.Ga. 1993) 845 F.Supp. 880, 885; see also *Lilly* v. *Grand Trunk R. Co.* (1943) 317 U.S. 481, 485 [63 S.Ct. 347, 350-351, 87 L.Ed. 411].) "It is clear that Congress manifestly intended to occupy the field of recovery for personal injuries to railroad employees incurred in the course of employment when it enacted FELA. See [*New York Cent. R.Co.* v.] *Winfield,* 244 U.S. [147,] 152, 37 S.Ct. [546,] 548 [61 L.Ed. 1045]." (*Nordgren* v. *Burlington Northern R. Company, supra,* 101 F.3d at p. 1252.)

In *Napier* v. *Atlantic Coast Line R. Co.* (1926) 272 U.S. 605 [47 S.Ct. 207, 71 L.Ed. 432], the United States Supreme Court was presented with the issue of the validity of state statutes which required all trains operating in the state to have an automatic firedoor and a cab curtain. A field preemption challenge to the statutes was made under the federal Locomotive Boiler Inspection Act (hereafter the BIA, codified in the federal Transportation Code, 49 U.S.C. § 20701 et seq.), enacted as an amendment to the FELA and intended to protect train service employees and the traveling public from defective locomotive boilers and equipment. (*Urie* v. *Thompson* (1949) 337 U.S. 163,

189-191 [69 S.Ct. 1018, 1034-1035, 93 L.Ed. 1282, 11 A.L.R.2d 252].)[8] The power delegated to the Interstate Commerce Commission by the BIA to prescribe regulations for locomotive equipment was found to be a "general one. It extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." (*Napier* v. *Atlantic Coast Line R. Co., supra,* at p. 611 [47 S.Ct. at p. 209].) The comprehensive scope of the authority conferred upon the commission to regulate the design, construction and material of every part of the locomotive, led the court to conclude that the BIA was intended to occupy "the field of regulating locomotive equipment used on a highway of interstate commerce," (*Napier* v. *Atlantic Coast Line R. Co., supra,* at p. 607 [47 S.Ct. at p. 207]) and therefore preempted additional state requirements for locomotive equipment. (*Id.,* at p. 613 [47 S.Ct. at p. 210].)

To support his argument against preemption, appellant relies primarily on the opinion in *Viad Corp.* v. *Superior Court, supra,* 55 Cal.App.4th 330, where the Second District confronted the issue of preemption in the context of negligence, strict product liability, warranty, personal injury and wrongful death actions brought by the real parties in interest, employees and relatives of employees of the Santa Fe and Southern Pacific railroads, against the petitioner for damages resulting from exposure to asbestos insulation contained on locomotives manufactured by the defendant's predecessor in interest. The petitioner in *Viad* claimed preemption of the state law tort causes of action by the BIA.

The court in *Viad* acknowledged the venerable decision in *Napier,* but was influenced by "a number of other factors" and "two recent Supreme Court cases," *Medtronic, Inc.* v. *Lohr* (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] (hereafter *Medtronic*) and *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238 [104 S.Ct. 615, 78 L.Ed.2d 443] (hereafter *Silkwood*) and concluded "that, notwithstanding *Napier,* the tort damages sought by real parties against petitioner are not preempted by the BIA." (*Viad Corp.* v. *Superior Court, supra,* 55 Cal.App.4th at pp. 336-337.)[9] The court in *Viad* departed from the holding in *Napier* under an altered preemption analysis

---

[8] "[I]t has been held consistently that the [BIA] supplements the [FELA] by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment. [Citations.]" (337 U.S. at p. 188 [69 S.Ct. at p. 1034].) In addition to the civil penalty, a person harmed by violation of the BIA is given recourse to sue under the FELA, which applies only to railroad employees injured while engaged in interstate commerce. (*Id.,* at p. 189 [69 S.Ct. at p. 1034]; see also *Crane* v. *Cedar Rapids & I. C. R. Co.* (1969) 395 U.S. 164, 166 [89 S.Ct. 1706, 1708, 23 L.Ed.2d 176].)

[9] *Medtronic, supra,* 518 U.S. 470, involved a tort suit against a pacemaker manufacturer under the federal Medical Device Amendments of 1976 (MDA) (21 U.S.C. § 360c et seq.) by a Florida woman injured when her pacemaker failed. The statute at issue in *Medtronic*

derived from *Medtronic* and *Silkwood* that focused on "a precise identification of what field is preempted by the federal legislation at issue." (*Viad Corp.* v. *Superior Court, supra,* 55 Cal.App.4th at p. 339.) The court concluded "that although *Napier* expressly involves the BIA and contains language that could be construed to support petitioner's position, we must nevertheless be guided by the analysis employed more recently in *Medtronic* and *Silkwood.* Although those cases involve different statutes, they are more directly applicable because they involve state law tort damages. The language in *Napier* that Congress intended to occupy 'the field of regulating locomotive equipment' must be read narrowly in light of the circumstances in existence at the time of its writing and in light of the statutory framework as a whole." (*Viad Corp.* v. *Superior Court, supra,* 55 Cal.App.4th at pp. 340-341, fn. omitted.) "Because . . . no intent to expressly preclude tort remedies against a manufacturer" was found in the BIA, the court declined

contained an express preemption clause, which prohibited establishment of any state requirement distinct from that contained in the MDA, but no provision regarding a right of action against manufacturers. Noting the presumption against preemption, the United States Supreme Court discerned Congress's purpose through examination of the "language of the pre-emption statute and the 'statutory framework' surrounding it. [Citation.]" (518 U.S. at p. 486 [116 S.Ct. at p. 2251].) Also relevant was "the 'structure and purpose of the statute as a whole,' [citation], as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (*Ibid.*)

In *Silkwood, supra,* 464 U.S. 238, a nuclear laboratory worker's father sued under state common law tort principles for injuries his deceased daughter had suffered from plutonium contamination. The United States Supreme Court held that a claim for punitive damages arising out of the escape of plutonium from a licensed nuclear facility was not preempted by the federal Atomic Energy Act (42 U.S.C. § 2011 et seq. (1976 ed. and Supp. V)), despite "an earlier decision, *Pacific Gas & Elec.* v. *Energy Resources Comm'n* (1983) 461 U.S. 190 [103 S.Ct. 1713, 75 L.Ed.2d 752], in which it had held that the same statute was intended to occupy 'the entire field of nuclear safety concerns.' (*Id.,* at p. 212 [103 S.Ct. at p. 1726].)" (*Viad Corp.* v. *Superior Court, supra,* 55 Cal.App.4th at p. 337 [discussing *Silkwood*].) In doing so, the court in *Silkwood* employed both a field preemption and a conflict preemption analysis, and relied upon a legislative history which revealed a congressional awareness of existing tort remedies as well as closely related legislation providing evidence that Congress did not intend to preclude those state law remedies. (*Silkwood, supra,* at p. 248 [104 S.Ct. at p. 621].) "[T]he only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available." (*Id.,* at p. 251 [104 S.Ct. at p. 623].) The Price-Anderson Act (Pub.L. No. 85-256 (1957) 71 Stat. 576) was passed as an amendment to the Atomic Energy Act; it established an indemnification scheme aimed at protecting the industry from potentially bankrupting state-law suits arising out of a nuclear incident. (*Silkwood, supra,* at p. 251 [104 S.Ct. at p. 623].) The court in *Silkwood* discussed the legislative history of the Price-Anderson Act at length, concluding that ". . . the discussion preceding its enactment and subsequent amendment indicates that Congress assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies." (*Silkwood, supra,* at pp. 251-252 [104 S.Ct. at p. 623], fn. omitted.) This was so "notwithstanding the NRC's exclusive regulatory authority." (*Id.,* at p. 254 [104 S.Ct. at p. 624].)

to "say the field, which *Napier* found to be completely occupied, includes tort liabilities not contemplated at the time *Napier* was written." (*Viad Corp.* v. *Superior Court, supra,* 55 Cal.App.4th at p. 339.)

We do not agree with *Viad* that the *Napier* analysis of the broad preemptive reach of the BIA and the FELA has been undermined by the decisions in *Medtronic* and *Silkwood.* First, *Medtronic* was not a field preemption case, but rather focused upon an express preemption provision in the MDA and accompanying regulations, which, in contrast to the BIA, the court found did not evince a legislative intent to foreclose established state tort remedies absent a direct threat of interference with a specific, articulated federal interest. (*Medtronic, supra,* 518 U.S. at p. 500 [116 S.Ct. at pp. 2257-2258].) Further, nothing in the BIA is comparable to the Atomic Energy Act examined in *Silkwood,* which in companion legislation demonstrated congressional intent to leave existing state tort remedies intact. (*Silkwood, supra,* 464 U.S. at pp. 251-252 [104 S.Ct. at pp. 626-624].) To promote the primary objective of safety, the FELA provided a federal remedy for injured employees where none existed before, leading to the inference that Congress intended to supplant other future remedies furnished by state law. Finally, given the interstate nature of railroads and the need for national uniformity of regulations, the impact of state tort actions and attendant conflicting liability determinations upon locomotive design, manufacture, materials and operation, militates in favor of preemption to avoid the unintended result of forced conformance with diverse state standards.

The Ninth Circuit reached the opposite conclusion of *Viad* in *Law* v. *General Motors Corp.* (9th Cir. 1997) 114 F.3d 908, 911-912, a case in which railroad workers claimed severe hearing loss due to excessive noise generated by locomotives, and sued the defendant locomotive manufacturers under various state law tort theories for defective design, failure to properly insulate work stations, and failure to warn of the risk of hearing loss. The court observed that the "broad preemptive sweep" of the BIA announced in *Napier* was "necessary to maintain uniformity of railroad operating standards across state lines. . . . Any state law that undermines this regime is preempted by the BIA." (*Law* v. *General Motors Corp., supra,* 114 F.3d at p. 910.) Preemption was extended to common law tort liability, not just direct state regulation of railroad safety. The court reasoned, "[i]t has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety, particularly as it relates to injuries suffered by railroad workers in the course of their employment." (*Id.,* at p. 910.) The railroad workers' "common-law claims" for damages due to hearing loss were found to "fall squarely within this preempted field." (*Ibid.*) The court in *Law* also

rejected the notion that the plaintiffs would be "without a remedy for their injuries" were manufacturers held not liable for design defects. (*Id.*, at p. 912.) Under the FELA, the court observed, railroad workers may "recover against their employers for all occupational injuries, including hearing loss caused by locomotive noise. . . . [¶] Thus, the federal government has established a comprehensive mechanism for vindicating the rights of railroad workers—a mechanism that doesn't undermine the BIA's goal of uniformity." (*Ibid.*; see also *First Sec. Bank* v. *Union Pacific R. Co.* (8th Cir. 1998) 152 F.3d 877, 880-881; *Springston* v. *Consolidated Rail Corp., supra,* 130 F.3d at pp. 244-245; *Missouri Pacific R.R.* v. *Railroad Com'n of Texas* (5th Cir. 1988) 850 F.2d 264, 268; *Marshall* v. *Burlington Northern Inc.* (9th Cir. 1985) 720 F.2d 1149, 1152; *Eldridge* v. *Missouri Pacific R.R.* (E.D.Okla. 1993) 832 F.Supp. 328; *In re Train Collision at Gary, Indiana* (Ind.Ct.App. 1996) 670 N.E.2d 902.)

We agree with the reasoning of *Law*, but are presented with an additional issue not directly confronted in that opinion: whether a cause of action for the *intentional* tort of fraudulent concealment falls within the comprehensive preemptive reach of the FELA. That the exclusive remedy provided by FELA preempts state law in actions by railroad employees predicated upon the *negligence* of their employers is well settled. (*Dice* v. *Akron, C. & Y. R. Co.* (1952) 342 U.S. 359 [72 S.Ct. 312, 96 L.Ed. 398]; *Wabash R. R.* v. *Hayes* (1914) 234 U.S. 86 [34 S.Ct. 729, 58 L.Ed. 1226]; *Nordgren* v. *Burlington Northern R. Company, supra,* 101 F.3d at p. 1250; *Janelle* v. *Seaboard Coast Line R. Co.* (5th Cir. 1975) 524 F.2d 1259, 1261; *Earwood* v. *Norfolk Southern Ry. Co., supra,* 845 F.Supp. at p. 885; *Felton* v. *Southeastern Pennsylvania Transp. Auth.* (E.D.Pa. 1991) 757 F.Supp. 623, 626-627; *Dawson* v. *Elgin, Joliet & Eastern Ry.* (1994) 266 Ill.App.3d 329 [203 Ill.Dec. 741, 640 N.E.2d 661, 663].) "[I]f the Federal Employers' Liability Act applies to an employee's negligence claim, the act supersedes a state's common and statutory law, even though the employee seeks relief in a state court." (*Chapman* v. *Union Pacific R.R.* (1991) 237 Neb. 617 [467 N.W.2d 388, 393].) Directing our attention to *Pikop* v. *Burlington Northern R. Co.* (Minn. 1986) 390 N.W.2d 743, appellant maintains that where, as here, an intentional tort has been asserted, the action "lies outside the scope of FELA," and no preemption occurs.

Although appellant's action for intentional misrepresentations is not premised upon principles of negligence, it nevertheless falls within the scope of an actionable claim under the FELA. ■ The provisions of the FELA make the railroad directly liable for "the negligence of any of the officers,

agents, or employees of such carrier . . . ." (45 U.S.C. § 51.)[10] The definition of "negligence" for purposes of the FELA is an expansive one, however, encompassing "any intentional tort which inflicts bodily injury upon the employee." (*Slaughter* v. *Atlantic Coast Line Railroad Company* (D.C.Cir. 1962) 302 F.2d 912, 915 [112 App.D.C. 327, 8 A.L.R.3d 436].) A plaintiff proceeding under the FELA "may prevail in an intentional tort case by showing either that the intentional tort was committed in furtherance of the employer's objectives or that the employer was negligent in hiring, supervising, or failing to fire the employee . . . ." (*Lancaster* v. *Norfolk and Western Ry. Co.* (7th Cir. 1985) 773 F.2d 807, 818; see also *Jamison* v. *Encarnacion* (1930) 281 U.S. 635, 641 [50 S.Ct. 440, 442-443, 74 L.Ed. 1082]; *Besta* v. *Consolidated Rail Corp.* (S.D.N.Y. 1984) 580 F.Supp. 869.) To rule otherwise and deny liability for intentional misconduct, a much graver breach of duty than negligence, would grant a plaintiff in a FELA case fewer rights than an "ordinary tort plaintiff," a result manifestly unintended by the act. (*Lancaster* v. *Norfolk and Western Ry. Co.*, *supra*, at p. 818.) Appellant's action against respondent for fraudulent concealment of the dangers of excessive noise is essentially one for failure to provide a safe place to work or failure to warn of known risks, both of which are authorized by the FELA. (See *Law* v. *General Motors Corp.*, *supra*, 114 F.3d at pp. 910-912; *Payne* v. *Baltimore and Ohio Railroad Company* (6th Cir. 1962) 309 F.2d 546, 549; *McClellan* v. *Pennsylvania R. Co.* (2d Cir. 1932) 62 F.2d 61, 63; *Holladay* v. *Chicago, Burlington & Quincy Railroad Co.* (S.D.Iowa 1966) 255 F.Supp. 879, 883-884; *Mortensen* v. *Southern Pacific Co.* (1966) 245 Cal.App.2d 241, 244 [53 Cal.Rptr. 851].)

Further, appellant seeks recovery for compensable physical injuries under the FELA. Thus is his case distinguishable from an intentional tort action for merely *emotional harm*, which is excluded from the coverage of the FELA, and was for that reason found *not* preempted by the federal statute in *Pikop* v. *Burlington Northern R. Co.*, *supra*, 390 N.W.2d at pages 753-755. (See also *Cavanaugh* v. *Burlington Northern R. Co.* (D.Minn. 1996) 941 F.Supp. 872, 878-879.)[11] In appellant's action, which falls within the scope of the FELA, the objective of a uniform federal compensatory scheme may be

---

[10]The elements of a FELA case are: (1) the injury occurred while the plaintiff was working within the scope of his or her employment with the railroad; (2) the employment was in furtherance of the railroad's interstate transportation business; (3) the employer railroad was negligent; and (4) the employer's negligence played some part in causing the injury for which compensation is sought under the Act. (*Smelser* v. *Norfolk Southern Ry. Co.* (6th Cir. 1997) 105 F.3d 299, 306, fn. 4; *Aparicio* v. *Norfolk & Western Ry. Co.* (6th Cir. 1996) 84 F.3d 803, 810.)

[11]In *Cavanaugh* and *Pikop*, actions for intentional infliction of emotional distress were found to lie "outside the scope" of FELA and were not preempted by it. In *Abate* v. *Southern*

compromised by a conflicting state system of compensation that authorizes a plaintiff to proceed with a case otherwise barred by the governing federal statute of limitations. (See *Law* v. *General Motors Corp., supra,* 114 F.3d at p. 912.) We do not ignore or minimize the state interest in protecting its citizens from fraudulent concealment of dangers by railroad employers, but conclude that where a remedy for it has been provided by the broad reach of the FELA, which occupies the field for personal injuries to railroad employees incurred in the course of employment, the state common law tort action is preempted.

## DISPOSITION

Accordingly, the judgment is affirmed.

Strankman, P. J., and Marchiano, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 21, 1999. Mosk, J., was of the opinion that the petition should be granted.

---

*Pacific Transp. Co.* (5th Cir. 1993) 993 F.2d 107, 112, however, the court ruled that an action for intentional infliction of emotional distress is preempted by the FELA.